### RAILROAD COMPANY *v.* FULLER.

A State legislature passed in 1862 an act " in relation to the duties of railroad companies," enacting—

  1st. That each railroad company should annually, in a month named by the act, fix its rates for the transportation of passengers and of freights of different kinds;

  2d. That it should, on the first day of the next month, cause a printed copy of such rates to be put up at all its stations and depots, and cause a copy to remain posted during the year;

  3d. That a failure to fulfil these requirements, or the charging of a higher rate than was posted, should subject the offending company to the payment of certain penalties prescribed.

  Congress, afterwards (in 1866), by an act whose title was " An act to *facilitate* commercial, postal, and military communication between the several States," and which recited that " the Constitution of the United States confers upon Congress, in express terms, the power to regulate commerce among the several States;" and goes on " *Therefore*, be it enacted," &c., enacted "That every railroad company in the United States, whose road is operated by steam . . . be, and hereby is authorized to carry upon and over its road, boats, bridges, ferries, all passengers, troops, government supplies, mails, freights, and other property on their way from any State to another State, and to *receive compensation therefor.*" And enacted further, " That *Congress* may at any time, alter, amend, or repeal this act."

  *Held*, in the case of a railroad running through several States, including that where the State enactment above mentioned had been made, that the State enactment was but a police law, and therefore constitutional.

ERROR to the Circuit Court for the District of Iowa; the case being thus:

A statute of Iowa " in relation to the duties of railroad companies," passed in 1862,* thus enacts:

"In the month of September, annually, each railroad company shall fix its rates of fare for passengers, and freights for transportation of timber, wood, and coal, per ton, cord, or thousand feet, per mile, also, its fare and freight per mile, for transporting merchandise and articles of the first, second, third, and fourth grades of freight.

  "And on the 1st day of October following, shall put up at

---

  * Laws of the Ninth General Assembly of the State of Iowa, second section, chapter 169.

all the stations and depots on its road, a printed copy of such fare and freight, and cause a copy to remain posted during the year.

"For wilfully neglecting so to do, or for receiving higher rates of fares or freight than those posted, the company shall forfeit not less than $100, nor more than $200, to any person injured thereby and suing therefor."

On the 15th of June, 1866,* Congress passed an act thus:

*"An Act to facilitate Commercial, Postal, and Military Communication among the several States.*

"Whereas, the Constitution of the United States confers upon Congress, in express terms, the power to regulate commerce among the several States, to establish post-roads and to raise and support armies; *therefore—*

"SECTION 1. *Be it enacted,* That every railroad company in the United States, whose road is operated by steam, its successors and assigns, be and is hereby authorized to carry upon and over its road, boats, bridges, and ferries, all passengers, troops, government supplies, mails, freight, and property on their way from any State to another State, and to *receive compensation therefor.* . . . Provided, &c.

"SECTION 2. *Be it further enacted,* That Congress may at any time, alter, amend, or repeal this act."

These two enactments, of the State and of the United States, being on the statute-books, the Chicago and North-western Railroad Company—a corporation chartered by Illinois and having its principal place of business at Chicago in that State, and working a continuous line of railway from the said Chicago, through Illinois, Iowa, and other States (by the legislatures of which, of course, the different parts of its road were authorized),—having posted their rates of freight and put up a schedule of them in their office, in the station, was transporting, in pursuance of the request of one Fuller, certain goods of his from the said Chicago in Illinois to a place called Marshalltown, in Iowa. Having charged and received from Fuller, as he alleged, a higher

---

* 14 Stat. at Large, 66.

rate of freight than that posted, Fuller sued them in one of the District Courts of Iowa to recover the penalty which the Iowa enactment purported to give in such a case. The company set up, among other defences, that the said enactment was in violation of that clause of the Constitution* which ordains that—

"Congress shall have power to regulate commerce with foreign nations and among the several States."

The court in which the suit was brought and the Supreme Court of the State on appeal from it, held that the enactment of Iowa was but a " police regulation," and accordingly that it was valid. Judgment going accordingly the case was now brought here.

*Messrs. H. C. Henderson and B. C. Cook, for the plaintiff in error:*

Whether, if the United States had *not* legislated upon the matter of " compensation " to railroad companies carrying " freight and property on their way from any State to another State," the enactment of Iowa would be good as falling within the language of cases like *Ex parte McNiel*,† *Willson* v. *The Blackbird Creek Marsh Company*,‡ *Gilman* v. *The City of Philadelphia*,§ and others—in which it is said that the States may legislate but only until Congress sees fit to do so—it is wholly irrelative to the present case to inquire. For here Congress by its act of June 15th, 1866, *has* legislated. And there was great reason (it may be said incidentally) why at that time Congress should legislate. Then for the first time our railways were about to cross the Rocky Mountains, to span the continent, and unite oceans. The subject had now become one of National importance. Congress, aroused by the vastness of this enterprise, saw the subject in its true relations, commercial, postal, and military; and accordingly it meant to take and did take the whole subject under its care, for the protection and benefit of all the people

---

* Article 1, § 8.                    † 13 Wallace, 240.
‡ 2 Peters, 250.                    § 3 Wallace, 728.

of the United States.   The act itself shows all this.   Its title is to "facilitate commercial intercourse . . . among the several States."   Its preamble recites that the Constitution of the United States confers upon *it* (Congress), in express terms, the power to regulate commerce between them, and, "*therefore*," it enacts.   Therefore it makes one *unconditional* provision about compensation to railroads carrying freight or property on its way, by steam and rail, "from any State to another State;" and there too it stops.   Has not Congress then "regulated" the subject?   If so, the right of the States by any view to do the same thing has ceased.   It is unimportant that Congress while acting has not seen fit in its regulations to go into a great variety of details.   Regulation does not necessarily consist in prescribing details, though when they are prescribed that too is "regulation;" perhaps not wise regulation.   What, however, is wise regulation and what unwise, Congress must when acting on the subject alone decide, and it has decided.   The right of the *State* to regulate at all has, therefore, ceased.   Yet here the State does attempt to regulate, and not only so but to regulate in opposition to Congress.   Congress gives to the railroad company the right "to carry," and to receive compensation "therefor;" that is to say, it gives to the company the right to receive compensation for carrying, simply.   The company is not bound, "in the month of September," to *fix* "rates" or "freights," or "on the 1st day of October following," to "put up at all the stations and depots on its road a printed copy of such fare and freights;" and by the legislation of Congress no one can sue the company and recover any $100 or any $200 penalty for its "wilfully neglecting so to do."   Congress leaves all this matter of fixing rates, and of announcing them, &c., to the agreement of the parties, and the laws of trade; and would refer any party aggrieved by a breach of contract to the ordinary remedies of justice.   But the State comes in, and that very part of the subject which Congress has regulated, and regulated in one way, *it* attempts to regulate, and to regulate in a different way; a way which does not "facilitate commercial in-

tercourse among the several States," but which rather em·
barrasses it by exposing the companies to the vexation and
odium of continual suits for *penalties.*

Further. As if to withdraw the whole matter in terms.
from being interfered with by State legislation, the act of
the National legislature says expressly:

" That *Congress* may at any time alter, amend, or repeal this
act."

The court below considered that the action of the State
was no regulation of commerce, and only a " police regula-
tion." What is police? Sir William Blackstone has defined
it in his Commentaries.* He says:

" By the public police and economy, I mean the due regula-
tion and domestic order of the kingdom, whereby the individuals
of the state, like the members of a well-governed family, are
bound to conform their general behavior to the rules of pro-
priety, good neighborhood, and good manners, and to be decent,
industrious, and inoffensive."

Police regulations are in their very nature local, confined
to the States enacting them, and can have no force or opera-
tion beyond those things which are purely internal to such
State. If they extend to or affect a commercial transaction.
between two or more States, or the citizens of two or more
States, they so far cease to be police regulations and become
regulations of commerce among the several States.

Now, this enactment was not local. If applicable to the
case at bar as the court below held it to be,—since it gave
judgment for an overcharge on the whole carriage from
Chicago, in Illinois, to Marshalltown in Iowa,—the enact-
ment applies as much to the whole road of the company as
to any part of it; to that part of it in Illinois and other
States as well as to that in Iowa, and to the freight or com-
pensation earned in another State as to that earned in Iowa.

*Messrs. J. Hubley Ashton and N. Wilson,* contra:

Admitting that the transportation of property by railroads

---

* Vol. 4, p. 162; and see Bouvier's Law Dictionary, Title " Police."

is " commerce," does the enactment of Iowa attempt to regulate it? In no sense does it interfere with the business of the roads. It places no restriction or impediment upon the free transportation by them of either property or persons. The times and places when and where they should receive and deliver whatever they transport is not interfered with. The terms, conditions, and circumstances under which they shall transact their business are in no manner provided for. In short, transportation upon these roads is just as free, just as untrammelled, as it was before the act. The transportation itself by these roads is in no sense regulated. The regulations of the act extend to the prevention of abuses, injustice, and oppression toward the people, resulting from the unfair and unlawful practices of the agents and officers of the corporation or of the corporations themselves. It is intended simply for the protection of the people of the State, and in its practical operation has no other effect. In this view it is, as the court below held it to be, a police regulation, and within the scope of the authority of the State government. If the State may rightfully prevent, by fit legislation, railroad corporations from destroying the property of its citizens through the negligent acts of their servants, and provide penalties to be imposed for such acts, may it not interpose its authority to protect the people from greater losses by fraudulent and unfair dealings of such servants, or of the corporations themselves? If the most insignificant municipality within the State through which a railroad runs may prescribe the rate of speed to be run by the cars of the corporation engaged in the business of transportation, in " commerce," for the purpose of protecting the property or persons of its citizens, may not the State so legislate as to prevent fraud and impositions by the corporation or its servants? It would be strange if the State, to whom the people look for the protection of their private rights and the security of property, is powerless, as against these corporations, that owe their very being to charters derived from State legislation, to prevent loss and injury to its citizens by fraudulent and unfair dealing.

Police regulations, while they may even affect commerce and operate upon those engaged therein, are not obnoxious to the Constitution of the United States.* Quarantine and health laws, under which vessels engaged in commerce may be delayed for weeks in completing their voyages, or cargoes may be seized and destroyed, and sailors and soldiers of the United States imprisoned and punished for their violation, are constitutional. This court has very recently† said, that it is not everything that affects commerce that amounts to a regulation of it within the meaning of the Constitution.

Mr. Justice SWAYNE delivered the opinion of the court.

The case lies within a narrow compass, and presents but a single question for our consideration. That question is not difficult of solution. The second section, chapter 169, of the laws of the ninth General Assembly of Iowa is as follows:

"In the month of September, annually, each railroad company shall fix its rates of fare for passengers and freight, for transportation of timber, wood, and coal per ton, cord, or thousand feet, per mile; also, its fare and freight per mile for transporting merchandise and articles of the first, second, third, and fourth grades of freight; and on the first day of October following shall put up at all stations and depots on its road a printed copy of such fare and freight, and cause a copy to remain posted during the year. For wilfully neglecting so to do, or for receiving higher rates of fare or freight than those posted, the company shall forfeit not less than one hundred dollars nor more than two hundred dollars to any person injured thereby and suing therefor."

The plaintiff in error was sued in the proper District Court of the State for violations of these provisions. Among other defences interposed, the company plead that the statute was in conflict with the commercial clause of the Consti-

---

* Gibbons *v.* Ogden, 9 Wheaton, 1; Brown *v.* Maryland, 12 Id. 419; The Mayor *v.* Miln, 11 Peters, 102; License Cases, 5 Howard, 504; Passenger Cases, 7 Id. 283.

† State Tax on Railway Gross Receipts, 15 Wallace, 293; Osborne *v.* Mobile, 16 Id. 479.

tution of the United States. Fuller demurred to the plea. The court sustained the demurrer and the company ex-cepted. The case was afterwards submitted to a jury. The company prayed the court to instruct them that the act was invalid by reason of the conflict before mentioned. The court refused, and the company again excepted. A verdict and judgment were rendered for the plaintiff. The company removed the case to the Supreme Court of the State, and there insisted upon these exceptions as errors. That court affirmed the judgment of the District Court, and the company thereupon prosecuted this writ of error. Was there error in this ruling?

The Constitution gives to Congress the power "to regulate commerce with foreign nations, and among the several States, and with the Indian tribes."

The statute complained of provides—

That each railroad company shall, in the month of September, annually, fix its rates for the transportation of passengers and of freights of different kinds;

That it shall cause a printed copy of such rates to be put up at all its stations and depots, and cause a copy to remain posted during the year;

That a failure to fulfil these requirements, or the charging of a higher rate than is posted, shall subject the offending company to the payment of the penalty prescribed.

In all other respects there is no interference. No other constraint is imposed. Except in these particulars the company may exercise all its faculties as it shall deem proper. No discrimination is made between local and interstate freights, and no attempt is made to control the rates that may be charged. It is only required that the rates shall be fixed, made public, and honestly adhered to. In this there is nothing unreasonable or onerous. The public welfare is promoted without wrong or injury to the company. The statute was doubtless deemed to be called for by the interests of the community to be affected by it, and it rests upon a solid foundation of reason and justice.

It is not, in the sense of the Constitution, in any wise a regulation of commerce. It is a police regulation, and as such forms " a portion of the immense mass of legislation which embraces everything within the territory of a State not surrendered to the General Government, all which can be most advantageously exercised by the States themselves."*

This case presents a striking analogy to a prominent feature in the case of *The Brig James Gray* v. *The Ship John Fraser.†* There the city authorities of Charleston had passed an ordinance prescribing where a vessel should lie in the harbor, what light she should show at night, and making other similar regulations. It was objected that these requirements were regulations of commerce and, therefore, void. This court affirmed the validity of the ordinance.

In the complex system of polity which exists in this country the powers of government may be divided into four classes:

Those which belong exclusively to the States.

Those which belong exclusively to the National Government.

Those which may be exercised concurrently and independently by both.

And those which may be exercised by the States but only until Congress shall see fit to act upon the subject.

The authority of the State then retires and lies in abeyance until the occasion for its exercise shall recur.‡

Commerce is traffic, but it is much more. It embraces also transportation by land and water, and all the means and appliances necessarily employed in carrying it on.§

The authority to regulate commerce, lodged by the Constitution in Congress, is in part within the last division of the powers of government above mentioned. Some of the rules prescribed in the exercise of that power must from the nature of things be uniform throughout the country. To

---

* Gibbons *v.* Ogden, 9 Wheaton, 1.        † 21 Howard, 184.
‡ Ex parte McNiel, 13 Wallace, 240.
§ 2 Story on the Constitution, §§ 1061, 1062.

that extent the authority itself must necessarily be exclusive, as much so as if it had been declared so to be by the Constitution in express terms.

Others may well vary with the varying circumstances of different localities. Where a stream navigable for the purposes of foreign or interstate commerce is obstructed by the authority of a State, such exercise of authority may be valid until Congress shall see fit to intervene. The authority of Congress in such cases is paramount and absolute, and it may compel the abatement of the obstruction whenever it shall deem it proper to do so. A few of the cases illustrating these views will be adverted to.

In *Willson* v. *The Blackbird Creek Marsh Company*,\* under a law of the State of Delaware, a dam had been erected across the creek. This court held that the dam was a lawful structure, because not in conflict with any law of Congress.

In *Gilman* v. *The City of Philadelphia*,† the State of Pennsylvania had authorized the erection of a bridge over the Schuylkill River, in the city of Philadelphia. This court refused to interpose, because there was no legislation by Congress affecting the river. The authority of Congress over the subject was affirmed in the strongest terms.

In *The Wheeling Bridge Case*,‡ the bridge was decreed to be a nuisance, because Congress "had regulated the Ohio River, and had thereby secured to the public the free and unobstructed use of the same." Congress subsequently legalized the bridge, and this court held the case to be thereby terminated.

In *Cooley* v. *The Board of Wardens*,§ the validity of a State law establishing certain pilotage regulations, was drawn in question. It was admitted by this court that the regulations were regulations of commerce, but it was held that they were valid and would continue to be so until superseded by the action of Congress.

In *Ex parte McNiel*,‖ the same question arose, and the doctrine of the preceding case was reaffirmed.

---

\* 2 Peters, 250.    † 3 Wallace, 728.    ‡ 18 Howard, 430.
§ 12 Howard, 319.    ‖ *Supra.*

In ·*The James Gray* v. *The John Fraser*,\* stress was laid upon the fact that there was no act of Congress in conflict with the city ordinance in question.  See, also, in this connection, *Osborne* v. *The City of Mobile.*†

If the requirements of ·the statute here in question were, as contended by the counsel for the plaintiff in error, *regulations of commerce,* the question would arise, whether, regarded in the light of the authorities referred to, and of reason and principle, they are not regulations of such a character as to be valid until superseded by the paramount action of Congress.  But as we are unanimously of the opinion that they are merely police regulations, it is unnecessary to pursue the subject.

JUDGMENT AFFIRMED.

---

\* 21 Howard, 184.                      † 16 Wallace, 479.