## CUBAN STEAMSHIP CO., Limited, v. FITZPATRICK, Mayor, et al.

### (Circuit Court, E. D. Louisiana. February 16, 1895.)

1. SHIPPING—DUTIES OF CREW—LOUISIANA CONSTITUTION AND ACT 76 OF 1880.
   The constitution of Louisiana (article 255) provides that the general assembly shall pass laws to prevent sailors and others of the crew of foreign vessels from working on the wharves and levees of the city of New Orleans, provided there is no treaty between the United States and foreign ports to the contrary. Act 76 of 1880, passed in pursuance of this provision, enacts that no sailor or portion of the crew of foreign vessels shall engage in working on the wharves or levees of New Orleans beyond the end of the vessels' tackle, but provides that it shall not apply to the crews of vessels hailing from countries having treaties with the United States to the contrary, nor to contracts of which the United States courts have jurisdiction. *Held,* that such constitutional provision and statute do not prohibit the crews of foreign vessels from loading and unloading their ships, such services being an implied part of every sailor's contract of employment, and within the jurisdiction of the United States courts, in admiralty.

2. CONSTITUTIONAL LAW—FOREIGN COMMERCE — LOUISIANA CONSTITUTION AND ACT.
   *Held,* further, that, if such constitutional provision and statute are intended to prohibit the rendering of such services by crews of foreign vessels, they are void, as regulations of commerce with foreign nations, because in contravention of the provisions of the constitution (article 1, § 8, par. 3) of the United States.

This was a suit by the Cuban Steamship Company, Limited, against the mayor and chief of police of the city of New Orleans, to enjoin said officers, their subordinates, etc., from interfering with the loading of a ship belonging to the plaintiff. Plaintiff moves for a preliminary injunction.

Farrar, Jonas & Kruttschnitt, for plaintiff.
E. A. O'Sullivan, for defendants.

PARLANGE, District Judge. Complainant, an alien corporation, domiciled in London, England, avers that it is the owner of the steamship Cayo Mono, of about 1,750 tons burden, duly registered as a British ship; that said ship is now lying in the port of New Orleans, where she has come to take on a general cargo to be transported from the United States to London and Antwerp; that she is engaged in commerce between Great Britain and the United States; that, while her officers and crew were lawfully and properly engaged in loading said ship with cargo, under the law of nations and the general rules of maritime law, the captain of the vessel was approached by a police officer belonging to the police force of the city of New Orleans, acting under instructions from the mayor of the city, and from the chief of police of the city; and that said police officer ordered said captain to desist from stowing or loading

said ship, under threat of arrest and punishment. Complainant avers that it is informed that the police officer, mayor, and chief of police claim to be acting under article 255 of the constitution of the state of Louisiana adopted in the year 1879, and also under Act No. 76 of the legislature of the state of Louisiana, approved April 7, 1880, both of which article of the state constitution and act of the legislature complainant avers to be null and void, as being a regulation of commerce with foreign nations, and therefore in contravention of paragraph 3 of section 8 of article 1 of the constitution of the United States. Complainant avers that in the treaties between the United States and Great Britain, no restrictive provisions of any nature have been imposed upon commerce between the ports of the two countries, or upon the ships plying between said ports; that a strike is now going on in the city of New Orleans by the screwmen and longshoremen who are generally engaged in the business of loading ships, and that such screwmen and longshoremen refuse to work themselves, and also refuse to permit any one else to work; that said ship is under engagements, limited as to time, and that, if complainant is not allowed to load its vessel with its own officers and crew, it will suffer irreparable damage and injury, as there is no person from whom it could recover the enormous damage that it would suffer by forcing its vessel to remain here day after day, unable to load; that said mayor and chief of police intend to harass complainant's officers and crew by daily and hourly arrests, and by numerous prosecutions, under the pretense of enforcing said void and unconstitutional legislation, and will continue to so harass said officers and crew, so as to make it impossible to load said vessel. Complainant prays for an injunction to issue to said mayor, chief of police, and all their subordinates, restraining them from interfering with the loading of said ship, or any other ship belonging to complainant, under color of said legislation averred to be null and unconstitutional.

To the rule nisi, the defendants answered that the injunction could not issue, because of article 255 of the constitution of Louisiana, and Act No. 76 of the state legislature of 1880; that said legislation does not attempt to regulate commerce, or to interfere therein, but was adopted and passed for the purpose of regulating the internal affairs of the state of Louisiana, and protecting the citizens within its territory; and that the said legislation is not in contravention of the constitution of the United States, because it is a police regulation for the maintenance of the well-being of the citizens of the state.

Article 255 of the constitution of Louisiana is not self-operating. It reads as follows:

"Art. 255. The general assembly shall pass necessary laws to prevent sailors or others of the crew of foreign vessels from working on the wharves and levees of the city of New Orleans, provided, there is no treaty between the United States and foreign powers to the contrary."

Act No. 76 of the state legislature of 1880 was apparently intended to carry out the constitutional article. Section 1 of said act provides:

"That no sailor, or portion of the crew of any foreign sea-going vessel, shall engage in working on the wharves or levee of the city of New Orleans beyond the end of the vessel's tackle."

Section 2 provides the punishment of imprisonment for the violation of section 1.

Section 3 reads:

"That the provisions of this act shall not apply to the officers, sailors or others of the crew of foreign vessels hailing from countries having any treaty, or treaties with the United States to the contrary, nor to any contract, or contracts of which the United States courts have jurisdiction."

The mere reading of section 3 of Act No. 76 of 1880, immediately prompts the inquiry whether, regardless of any question of conflict with the constitution of the United States, the state statute affords the police authorities any warrant to prevent the crews of foreign vessels from loading and unloading their own ships in the port of New Orleans. Does the state statute, which the defendants plead as their warrant, command or authorize them to make the threatened arrests? In ascertaining the purpose and scope of Act No. 76 of 1880, we are materially assisted by the language of Act No. 73 of the legislature of 1874, entitled "An act to prohibit the unlawful employment of sailors at work upon the levees or banks of the rivers in this state, and to punish violations of this act." The act of 1874 does not confine its operation to the wharves and levees of New Orleans, and is directed against officers or stevedores who employ sailors "at work on the levees of the state of Louisiana not strictly belonging to and included in regular sailor's duty, as defined and prescribed by the maritime law governing the employment and duty of sailors." It is perfectly plain that the work which this act intended to prohibit sailors from performing, was work other than loading and unloading their own vessels, because it specifically exempts from its operation work "included in regular sailor's duty, as defined and prescribed by the maritime law." Of course, whether loading and unloading their own ships in a foreign port, are among the regular duties of sailors, is not a debatable question. What the other work intended to be prohibited was, it is idle to inquire.

Act No. 76 of 1880 is exactly on the same lines as Act No. 73 of 1874, so far as concerns the work which it was intended to prohibit. Section 3 of said act, providing that the statute should not apply to "any contract or contracts of which the United States courts have jurisdiction," was an amendment to the original bill by the senate judiciary committee. The amendment was meant to say, and does say, precisely what the language of the act of 1874 expressed when it excepted from its operation work "strictly belonging to and included in regular sailor's duty, as defined by the maritime law governing the employment and duty of sailors." In the matter at bar, an express contract requiring complainant's sailors to work cargo when required, has been proven. An extract from the shipping articles is on file. But, even if there were no express contract, loading and unloading cargo in a foreign port are implied conditions of every sailor's employment. Fland. Mar. Law (Ed. 1852) p. 411, § 502; Judge Peters, in the case of The

Happy Return, 1 Pet. Adm. 254, Fed. Cas. No. 13,697; Maude & P. Merch. Shipp. pp. 177, 178; Justice Story, in Cloutman v. Tunison, 1 Sumn. 373, Fed. Cas. No. 2,907. It is perfectly apparent that Act No. 76 of 1880 did not attempt to prevent sailors of foreign vessels from loading and unloading their ships, but, on the contrary, specially excepts them. The act, regardless of any question of conflict with the constitution of the United States, affords the defendants no authority or warrant whatever to consummate the threatened arrest of complainant's sailors.

If this view is erroneous, and if the state statute does not except sailors of foreign vessels when loading and unloading their own vessels, then the question arises whether the statute could stand as against the provisions of the constitution of the United States, appealed to by complainant. The power to regulate commerce with foreign nations being exclusively vested in congress, can a state enact a law discriminating as between foreign and domestic vessels, and declaring that the crews of foreign vessels loading or unloading their own vessels in a port of the state shall be imprisoned? Is it true, that, while a state cannot prevent a foreign vessel from entering its ports, it has the power to imprison its officers and crew if the ship unloads or reloads a single parcel of cargo? If this be so, the right to enter an American port is an utterly barren one, for the whole object of the enterprise is not to enter the port with cargo, but to land the cargo. The contention amounts to saying that the states have the right to absolutely cut off trade and commerce with foreign nations.

In Leisy v. Hardin, 135 U. S. 108, 10 Sup. Ct. 681, the supreme court of the United States said:

"The power vested in congress 'to regulate commerce with foreign nations and among the several states and with the Indian tribes' is the power to prescribe the rule by which that commerce is to be governed, and is a power complete in itself, acknowledging no limitations other than those prescribed by the constitution. It is coextensive with the subject on which it acts, and cannot be stopped at the external boundary of a state, but must enter its interior, and must be capable of authorizing the disposition of those articles which it introduces, so that they may become mingled with the common mass of property within the territory entered;" citing Gibbons v. Ogden, 9 Wheat. 1; Brown v. Maryland, 12 Wheat. 419.

In the case of Leisy v. Hardin, just cited, which arose from an interference with interstate commerce, the supreme court cited Brown v. Maryland, supra, which arose from an interference with foreign commerce; and, as to its applicability, the supreme court said that Chief Justice Marshall had laid down that the principles expounded in Brown v. Maryland applied equally to importations from a sister state, and the court added:

"Manifestly, this must be so, for the same public policy applied to commerce among the states as to foreign commerce, and not a reason could be assigned for confiding the power over the one which did not conduce to establish the propriety of confiding the power over the other."

Brown v. Maryland, supra, was a case in which a state had made it a penal offense for an importer to sell a package of goods in the form in which it was imported, without having paid a license to the

state. In that case, far less was contended for on the part of the state than is contended for here. It was not contended that the state could prevent the landing of the package. Chief Justice Marshall said:

"What, then, is the just extent of a power to regulate commerce with foreign nations and among the several states? * * * The power is coextensive with the subject on which it acts, and cannot be stopped at the external boundary of a state, but must enter its interior. * * * If this power reaches the interior of a state, and may be there exercised, it must be capable of authorizing the sale of those articles which it introduces. Commerce is intercourse. One of its most ordinary ingredients is traffic. It is inconceivable that the power to authorize this traffic * * * should cease at the point when its continuance is indispensable to its value. To what purpose should the power to allow importation be given, unaccompanied with the power to authorize a sale of the thing imported? Sale is the object of importation, and is an essential ingredient of that intercourse of which importation constitutes a part. * * * It must be considered as a component part of the power to regulate commerce."

The reasoning applies with still greater force when the right claimed is to prohibit foreign vessels from even unloading or loading a cargo. See, also, Story, Const. § 1068.

In Bowman v. Railway Co., 125 U. S. 465, 8 Sup. Ct. 689, 1062, the supreme court of the United States held that a state has no power to prohibit an interstate railway from bringing into its borders, from another state, an article of commerce; even though the sale of the article within the state is prohibited by the penal laws of the state.

In the Original Package Cases (Leisy v. Hardin, 135 U. S. 100, 10 Sup. Ct. 681; Lyng v. Michigan, 135 U. S. 161, 10 Sup. Ct. 725) far less was contended for on behalf of the state than is here claimed. It was virtually admitted that a state could not prohibit the importation of an article of commerce into, and the delivery of the same within its territory, but it was claimed that the state could prohibit its sale by the importer. The supreme court held substantially that the state could neither prohibit the importation nor the sale of the article in its original condition, by the importer.

The power of congress to regulate commerce extends to the persons who conduct navigation as well as the instruments used. Cooley v. Wardens, 12 How. 316. See Story, Const. § 1061. Chief Justice Marshall, in Gibbons v. Ogden, says: "To regulate commerce is to prescribe the rule by which commerce is to be governed." And see Justice Miller's Lectures, p. 449. Commerce embraces transportation by land and water, and all the means and appliances necessarily employed in carrying it on. Railroad Co. v. Fuller, 17 Wall. 568; Gibbons v. Ogden, 9 Wheat. 193; South Carolina v. Georgia, 93 U. S. 10; Railroad Co. v. Husen, 95 U. S. 470; Gloucester Ferry Co. v. State, 114 U. S. 196, 5 Sup. Ct. 826; also Justice Miller's Lectures, p. 447.

That the right to prohibit the sailors of foreign vessels from loading and unloading their ships is a police regulation, seems to be a self-refuting proposition. The intention of the regulation was not to preserve the life, health, morals, peace, or safety of the citizens of the state; nor was it to protect any other right coming even remotely under the police power. At the hearing, counsel for de-

fendants stated that he raised no question as to the fact that defendants are municipal officers. Nor could any contention on that point have been successfully made.

In Pennoyer v. McConnaughy, 140 U. S. 1, 11 Sup. Ct. 699, the supreme court maintained an injunction against a state board, comprising the governor, secretary of state, and treasurer. Justice Lamar, as the organ of the court, stated that two classes of actions against state officers have appeared in the decisions of the supreme court, viz.:

"The first class is where a suit is brought against the officers of the state, as representing the state's action and liability, thus making it, though not a party to the record, the real party against which the judgment will so operate as to compel it to specifically perform its contracts. [Citing cases.] The other class is where the suit is brought against defendants, who, claiming to act as officers of the state and under the color of an unconstitutional statute, commit acts of wrong and injury to the rights and property of the plaintiff acquired under a contract with the state. Such suit, whether brought to recover money or property in the hands of such defendants unlawfully taken by them in behalf of the state, or for compensation in damages, or in a proper case, where the remedy at law is inadequate, for an injunction to prevent such wrong and injury, or for a mandamus in a like case, to enforce upon defendant the performance of a plain legal duty, purely ministerial, is not, within the meaning of the eleventh amendment, an action against the state. [Citing cases.] * * * The general doctrine of Osborn v. Bank, 9 Wheat. 738, that the circuit courts of the United States will restrain a state officer from executing an unconstitutional statute of the state, when to execute it would violate rights which had been guarantied by the constitution, and would work irreparable damage and injury, * * * has never been departed from. On the contrary, the principles of that case have been recognized and enforced in a very large number of cases, notably in those we have referred to as belonging to the second class of cases above mentioned."

The language of Justice Lamar was reiterated by the supreme court in Reagan v. Trust Co., 154 U. S. 388, 14 Sup. Ct. 1047, in which an injunction against the attorney general of Texas, restraining him from prosecuting under the Texas railroad commission act, was sustained. In that case the supreme court cited the language used in Cunningham v. Railroad Co., 109 U. S. 446, 452, 3 Sup. Ct. 292, 609:

"Another class of cases is where an individual is sued in tort for some act injurious to another, in regard to person or property, to which his defense is that he acted under the orders of the government. In these cases he is not sued as or because he is an officer of the government, but as an individual, and the court is not ousted of jurisdiction because he asserts authority as such officer. To make out his defense, he must show that his authority was sufficient in law to protect him. [Citing cases.]"

The court then went on to say:

"Nor can it be said in such a case that relief is attainable only in the courts of the state. For it may be laid down as a general proposition that, wherever a citizen of a state can go into the courts of a state to defend his property against the illegal act of its officers, a citizen of another state may invoke the jurisdiction of the federal courts to maintain a like defense. A state cannot tie up a citizen of another state, having property rights within its territory invaded by unauthorized acts of its own officers, to suits for redress in its own courts."

It is clear that Act No. 76 of 1880 does not authorize the contemplated arrests, and, if it does, it is null, as being in contravention

of the federal constitution.    The defendants are absolutely without warrant or authority to make the arrests, and the preliminary injunction must issue.