UNITED STATES v. SLATER.

SAME v. FRANDSEN.

(District Court, D. Nevada. March 23, 1903.)

Nos. 997, 998.

1. DISEASED ANIMALS—DRIVING FROM ONE STATE TO ANOTHER—STATUTES.

Act May 29, 1884, 23 Stat. 31, § 6 [U. S. Comp. St. 1901, p. 299], provides that no carrier shall receive for transportation, or transport from one state to another, any live stock affected with a contagious disease; that no one shall deliver for such transportation any live stock knowing them to be affected with any contagious disease; and that no one shall drive on foot or transport in private conveyance from one state to another any live stock knowing them to be affected with any contagious disease. Section 7 [page 3184] provides that it shall be the duty of the Commissioner of Agriculture to notify any carrier doing business in or through any infected locality of the existence of said contagion, and that any carrier or owner of such live stock in such infected district, who shall knowingly violate the provisions of section 6, shall be guilty of a misdemeanor, punishable in a certain way. *Held*, that it is made a misdemeanor, and punishment provided therefor, for one to drive live stock from one state to another knowing them to have a contagious disease, though they are not driven from a district against which the Commissioner of Agriculture has declared a quarantine.

2. SAME—INTERSTATE COMMERCE.

Act May 29, 1884, 23 Stat. 31 [U. S. Comp. St. 1901, p. 299], making it a misdemeanor for one to drive live stock on foot from one state to another knowing them to have a contagious disease, is within the power given to Congress to regulate interstate commerce.

**3. SAME—INFORMATION—RULES OF DEPARTMENT OF AGRICULTURE.**

Though it may be better practice, it is not necessary that an information for driving diseased animals from one state to another, contrary to the statute and the rules and regulations of the Department of Agriculture, set out such rules and regulations; the court may take judicial notice of them.

**4. SAME—ORDER OF DEPARTMENT OF AGRICULTURE.**

An order of the Department of Agriculture giving notice that scabies exists among sheep in the United States, and that it is a violation of law to receive for transportation, to transport, or to deliver for transportation from one state to another, any stock affected with such disease, or to drive from one state to another any sheep knowing them to be affected with such disease, is proper, though not specifying any particular district within which a quarantine has been established.

On Demurrer.

Sardis Summerfield, U. S. Atty.

Norcross & Orr and Trenmor Coffin, for defendants.

HAWLEY, District Judge. These cases are substantially alike, and are presented upon informations filed by the United States attorney by leave of the court. The information in each case contains two counts. In the first of these cases the first count charges that "U. M. Slater on or about the 4th day of September, A. D. 1902, at Washoe county, Nevada, then and there being an owner of about twenty-five hundred sheep, did unlawfully drive on foot said sheep from the state of California into the state of Nevada while at the said time and place said sheep to the knowledge of the said U. M. Slater were affected with a certain contagious disease, to wit, scabies, commonly known as and called 'sheep scab,' contrary to the form of the statute in such cases made and provided, and against the peace and dignity of the United States of America." The second count, as to the acts charged, is identically the same as in the first count, with the addition that said acts were committed "contrary to the form of the statute, and to the rules and regulations of the Secretary of Agriculture, and of the Commissioner of Agriculture, made, certified, and published, in pursuance thereof made and provided, and against the peace and dignity of the United States of America." The information against Frandsen is the same, except it charges, in addition to his being an owner, that he was "custodian of and having control over the sheep."

Demurrers are interposed to these informations upon the grounds (1) that said first count does not state facts sufficient to constitute a public offense; that it does not appear that the state of California was an infected district or a district infected with "scabies" or "sheep scab," or that the Secretary of Agriculture or the Commissioner of Agriculture had ever determined the state of California to be an infected district, or had made any order or rules or regulations or given or published any notice in relation thereto; (2) that the facts stated in said second count do not constitute a public offense; that it does not appear what rules or regulations were ever made by the Secretary of Agriculture, or by the Commissioner of Agriculture, or that said Secretary or said Commissioner of Agriculture ever made any

order, rule, or regulation concerning the disease known as "scabies," commonly called "sheep scab," or ever gave or published any notice concerning the same in the state of California.

The questions to be determined depend upon the interpretation to be given to the act of Congress entitled "An act for the establishment of a Bureau of Animal Industry, to prevent the exportation of diseased cattle, and to provide means for the suppression and extirpation of pleuro-pneumonia and other contagious diseases among domestic animals," approved May 29, 1884, 23 Stat. 31 [U. S. Comp. St. 1901, p. 299]. This act consists of 11 sections. The entire act will, of course, be considered, but it is only necessary to call special attention to sections 6 and 7 [U. S. Comp. St. 1901, p. 3184], which read as follows:

"Sec. 6. That no railroad company within the United States, or the owners or masters of any steam or sailing or other vessel or boat, shall receive for transportation or transport, from one state or territory to another, or from any state into the District of Columbia, or from the District into any state, any live stock affected with any contagious, infectious, or communicable disease, and especially the disease known as pleuro-pneumonia; nor shall any person, company, or corporation deliver for such transportation to any railroad company, or master or owner of any boat or vessel, any live stock, knowing them to be affected with any contagious, infectious, or communicable disease; nor shall any person, company, or corporation drive on foot or transport in private conveyance from one state or territory to another, or from any state into the District of Columbia, or from the District into any state, any live stock knowing them to be affected with any contagious, infectious, or communicable disease, and especially the disease known as pleuro-pneumonia.

"Sec. 7. That it shall be the duty of the Commissioner of Agriculture to notify, in writing, the proper officials or agents of any railroad, steamboat, or other transportation company doing business in or through any infected locality, and by publication in such newspapers as he may select, of the existence of said contagion; and any person or persons operating any such railroad, or, master or owner of any boat or vessel, or owner or custodian of or person having control over such cattle or other live stock within such infected district, who shall knowingly violate the provisions of section six of this act, shall be guilty of a misdemeanor, and, upon conviction, shall be punished by a fine of not less than one hundred nor more than five thousand dollars, or by imprisonment for not more than one year, or by both such fine and imprisonment."

It is proper here to state that by the act approved February 9, 1889, 25 Stat. 659 [U. S. Comp. St. 1901, p. 285], the Department of Agriculture was made an executive department, and that by the act of March 2, 1889, 25 Stat. 835, 840, the authority granted to the Commissioner of Agriculture by the act under discussion establishing the Bureau of Animal Industry, and by the provision of the appropriation act for the Agricultural Department approved July 18, 1888, relating to that bureau, was vested in the Secretary of Agriculture.

There are numerous points urged by defendants in support of their demurrer, some of which, if sustained, are vital, and would prevent any further prosecution of these cases. There are other points, especially in relation to the second count, which only attack the sufficiency of the facts stated in the informations. The questions involved have been ably argued, and many of the points urged by the respective counsel demand careful consideration. The researches of counsel

have failed to find any case upon the same or similar state of facts. The court must therefore proceed without the aid or assistance of any precedent, without any direct beacon light to guide it, save and except the language of the act itself, and such indicia as may be gleaned from the decided cases in relation to the general subject, and the aid derived from the established canons of construction, involving the interpretation of all statutes.

Looking first at the act itself, it will be found that Congress, by its passage, had in view the necessity of taking some means to protect the interests of persons engaged in raising live stock, to promote and develop the live stock industry, and to prevent the spread of dangerous, contagious, infectious, and communicable diseases among the live stock of the country at large. The objects sought to be secured, and the business of the live stock interests sought to be protected and regulated, were of vast importance, and necessarily required legislation upon many different conditions that existed or that might arise. This general idea is made clear by an examination of the entire act, and is also embodied in the provisions of section 6, an examination of which shows that there were three distinct offenses which Congress intended to reach, and for a violation of either of the provisions therein contained Congress intended the parties should be punished: (1) Railroads, steamboats, or other vessels are prohibited from receiving for transportation from one state to another any live stock affected with any of the diseases mentioned in the act; (2) all persons, companies, or corporations are prohibited from delivering to any railroad company or other common carriers any live stock knowing them to be affected with either of the named diseases. Then comes the third one, for a violation of which the informations in the present cases were filed: "Nor shall any person, company, or corporation drive on foot or transport in private conveyance from one state * * * to another * * * any live stock, knowing them to be affected with any contagious, infectious, or communicable disease." It is contended that the defendants should be discharged because the act does not provide any penalty for the commission of the acts charged against the defendants herein; that the acts performed by them are declared to be unlawful, yet Congress either designedly, inadvertently, or by mistake overlooked the necessity of prescribing any penalty for the unlawful act. The conclusions of counsel upon this point may be conceded to be correct if the premises upon which the point is made are well founded. But is it true that no penalty is prescribed for the unlawful acts as herein charged? Section 7, imposing the penalty, expressly covers and includes the acts charged against these defendants. After referring to the offenses mentioned in subdivisions 1 and 2 of section 6, it adds, "Or owner or custodian of, or person having control over such cattle or other live stock * * * who shall knowingly violate the provisions of section six of this act shall be guilty of a misdemeanor, and upon conviction shall be punished," etc. The contention of counsel is based principally upon the frequent intermingling of the words "infected district," "within such infected district," or the establishing of a "quarantine in such district," used throughout the provisions of the act.

Admitting, for the purpose of meeting the arguments of counsel, that the words above quoted are, in some instances, used in such a manner as to give some support to the position taken by defendants, and conceding that the act is not, in all respects, as carefully drawn as it might have been, still the inquiry arises: Why were the words referred to so frequently used and intermingled with other matters in the various sections of the act? For what object and purpose were they inserted in the act, and what effect should be given to them? Is it not manifest from a thorough examination of all the provisions of the act that the authority therein given to the Commissioner of Agriculture to ascertain the districts infected with the diseases of live stock, mentioned in the act, to establish a quarantine over such districts, to publish the fact that the named districts were infected, and that a quarantine had been established, and the power given him to organize a Bureau of Animal Industry, and prescribe the duties of its officers and attaches, was not intended to give the owners or custodians of live stock, or other parties mentioned in the act, the privilege of transporting from one state to another any live stock which might be found outside of such established infected districts and localities not quarantined, known by the parties transporting the same to be affected with "any contagious, infectious, or communicable disease"?

One of the cardinal principles of interpretation is that it is the duty of the courts to arrive at the intention of the legislative body in passing the act. The whole act, its object and purpose, as well as its language, must be considered. Another rule is that, where the act is legally susceptible of two constructions, it is the duty of the courts to avoid giving it a construction that would lead to an absurdity. Moreover, the rule is universal that all statutes should be reasonably and sensibly construed. Is it not apparent, when all of these things are considered, that Congress intended the penalty prescribed in section 7 to apply to all of the offenses mentioned in section 6? The nature of the offenses mentioned therein is different. But in each the scienter of the party or parties committing the act is one of the ingredients constituting the offense; hence it was deemed necessary to make it the duty of the Commissioner of Agriculture to take proper steps to ascertain the district where live stock was infected with disease, or to declare a quarantine against the transportation of the stock from any infected district, and to publish the fact of such infected district, and of the quarantine ordered in certain localities, so that the means of information could be more directly brought within the knowledge of the railroad and steamship companies and other parties mentioned in section 6.

The publication of the fact that a certain district in any state or territory was infected with the disease, or that a quarantine had been established prohibiting the removal of any sheep therefrom, was intended to impart constructive notice to the parties prohibited from transporting sheep therefrom.

All that has been said with reference to the penalty applies with equal force to the contention of defendants that the facts stated in the informations do not constitute any offense; for there is not any valid

and substantial reason why parties coming within the third subdivision should not be punished, without any publication being made by the Commissioner of Agriculture to the effect that the district from which the sheep came was infected, if, as is alleged, the defendants drove said sheep across the state line knowing that they "were affected with a certain contagious disease, to wit, 'scabies,' commonly known as and called 'sheep scab.'" The evil and injurious results would follow, the same as if they were driven from an infected district, declared to be such by the Commissioner or Secretary of Agriculture. The difference is only in degree. If defendants' contention on this ground were sustained, it would virtually ignore the intent of the lawmakers, destroy the objects had in view by Congress, and lead to absurd results.

From the views already expressed, it necessarily follows that the statute itself makes it a misdemeanor to transport or drive on foot from one state to another any live stock known to be affected with any of the diseases specified in the act, irrespective of the question whether or not the Secretary of Agriculture had established an "infected district" from which the sheep came from California, or whether or not any quarantine had been established covering any portion of the state. The conclusions reached upon this point are in accord with the views expressed by the Supreme Court in Railway Company v. Haber, 169 U. S. 613, 625, 18 Sup. Ct. 488, 42 L. Ed. 878. In that case the court had before it the question whether an act of the state of Kansas relating to bringing into the state cattle liable of communicating Texas, splenic, or Spanish fever to any domestic cattle in the state had been superseded by the act of Congress of March 29, 1884, and amendments thereto. In the course of the opinion it became necessary to discuss at length the animal industry act passed by Congress to determine its effect and meaning. Ten sections of this act are copied at length, and the court in relation thereto, among other things applicable to the question here under discussion, said:

"The act of Congress did not assume to give any corporation, company, or person the affirmative right to transport, from one state to another state, cattle that were liable to impart or capable of communicating contagious, infectious, or communicable diseases. On the contrary, it was made a misdemeanor to deliver for transportation, or to transport or drive from one state to another, cattle known to be affected with contagious, infectious, or communicable diseases."

It is earnestly contended by defendants that the acts charged in the informations do not come within the power of Congress to regulate; that Congress can only act in relation to such acts as come within the province of interstate commerce; that in interstate commerce there is trade, traffic, or intercourse involved, or else Congress is dealing with the highways of commerce, and numerous cases defining what is commerce are cited, which it is argued sustain this position. An examination of these cases shows that the definitions therein given have, in most cases, a special reference to the facts of each particular case, and it may be said that in none of them has there been any attempt to cover all the facts which might bring any given case within the province of interstate commerce. Of course, in the general sense, commerce consists of intercourse, trade and traffic between the citizens of

different states, and includes the transportation of persons and property, as well as the purchase, sale, and exchange of commodities. This general definition is found in many cases, commencing with the case of Gibbons v. Ogden, 9 Wheat. 1, 197, 6 L. Ed. 23, and continuing to the present time. Reid v. Colorado, 187 U. S. 137, 147, 23 Sup. Ct. 92, 47 L. Ed. ——. It would serve no useful purpose to review these cases. An examination of them has convinced me that the acts charged in the present cases clearly come within the power of Congress with reference to its authority in dealing with interstate commerce. In Railroad Co. v. Fuller, 17 Wall. 565, 568, 21 L. Ed. 710, the court said: "Commerce is traffic; but it is much more. It embraces also transportation by land and water, and all the means and appliances necessarily employed in carrying it on." In Railroad Co. v. Husen, 95 U. S. 465, 469, 24 L. Ed. 527, it was held that the statute of Missouri which prohibited the driving of Texas, Mexican, or Indian cattle into the state of Missouri during certain portions of each year was in conflict with the Constitution, which ordains that "Congress shall have power to regulate commerce with foreign nations, and among the several states, and with the Indian tribes." In the course of the opinion, the court said:

"It seems hardly necessary to argue at length that, unless the statute can be justified as a legitimate exercise of the police power of the state, it is a usurpation of the power vested exclusively in Congress. It is a plain regulation of interstate commerce—a regulation extending to prohibition. Whatever may be the power of a state over commerce that is completely internal, it can no more prohibit or regulate that which is interstate than it can that which is with foreign nations. Power over one is given by the Constitution of the United States to Congress in the same words in which it is given over the other, and in both cases it is necessarily exclusive. That the transportation of property from one state to another is a branch of interstate commerce is undeniable, and no attempt has been made in this case to deny it."

With reference to the points raised in the demurrers to the second counts, many suggestions were made which need not—in the light of the conclusions already reached—be discussed.

It is evident that the second counts in the informations were added out of abundant caution, in order that, if the court should not sustain the first count, the government might be able to sustain the charge made against the defendants under the second count, under the rules and regulations promulgated by the Secretary of Agriculture. I do not understand defendants' counsel to claim that any of the rules or regulations of the department exceed the authority given to the department by the act in question. The power of Congress to delegate authority to its officers, who are required by the law to act under its general provisions, and to prescribe the details necessary to be pursued in the enforcement thereof, is unquestioned, and if the rules, orders, and regulations so prescribed are within constitutional limits, and are of the character designated by the act, they have the force and effect of law. Dastervignes v. United States, 122 Fed. 30, 35, and authorities there cited.

It is argued that the informations as to the second count are insufficient, because they do not set out the particular rules and regulations of the department with reference to the subject-matter of the informa-

tions. It might be the better practice so to do, or at least to make such reference to the particular rule or regulation relied upon as would notify the defendants of the particular charge against them. But the question suggested and discussed, that the court could not take judicial notice of such rules and regulations, has been determined adversely to the contention of defendants' counsel. Caha v. United States, 152 U. S. 211, 221, 14 Sup. Ct. 513, 38 L. Ed. 415, and authorities there cited.

The order issued by the Secretary of Agriculture on June 18, 1897, designated as "B. A. I. Order No. 5" (to which specific objections were urged because it did not specify any particular district or declare within what specific territory a quarantine had been established), was evidently issued for the purpose of giving general information of the existence of the contagious disease throughout the United States. It is a general order directed "to the managers and agents of railroads and transportation companies of the United States, stockmen and others." After referring to the act under consideration, and to an act making certain appropriations to the department, it reads as follows:

"You are hereby notified that the contagious disease known as sheep scab, or scabies of sheep, exists among sheep in the United States, and that it is a violation of the law to receive for transportation, or transport, any stock affected with said disease from one state or territory to another, or from any state into the District of Columbia, or from the District into any state. It is also a violation of the law for any person, company, or corporation to deliver for such transportation to any railroad company, or master or owner of any boat or vessel, any sheep, knowing them to be affected with said disease, and it is also unlawful for any person, company, or corporation to drive on foot or transport in private conveyance from one state or territory to another * * * any sheep, knowing them to be affected with said disease. All transportation companies and individuals shipping, driving, or transporting sheep are requested to co-operate with this department in enforcing the law for preventing the spread of the said disease. Inspectors of the Bureau of Animal Industry are directed to report all violations of this act which come to their attention."

This order is so worded as to give notice that it would be a violation of the law to commit any of the specified acts, and was a proper order for the department to make.

The demurrers are overruled.