W. B. GARRISON v. SOUTHERN RAILWAY COMPANY.

(Filed 5 May, 1909.)

1. Interpretation of Statutes—Intention—Impossible Requirements—
   Punishment.

   In the construction of a statute the court will avoid attributing to the Legislature the intention to punish the failure to do an impossible thing.

2. Carriers of Freight—Penalty Statutes—Refusal to Accept Freight—
   Tender—Accumulated Penalties.

   When the common carrier permits a shipper to load a car with his goods and refuses to receive it for shipment or to issue a bill of lading, it is a refusal to receive the goods for shipment, under

the Revisal, sec. 2631; and when the shipper leaves the goods in the car, with request for shipment, and by his conduct, understood by the railroad, makes his tender continuous, each day's delay is a separate refusal, within the meaning of the statute, to which the penalty will apply.

3. **Carriers of Freight—Penalty Statutes—Refusal to Accept Freight—Defenses at Common Law—Insufficient Defense—Evidence Rejected.**

A railroad company may show, in defense to an action for refusal to receive goods for shipment when tendered (Revisal, sec. 2631), such matters as would excuse its failure to do so at common law, unavoidable conditions then existing, over which it had no control; when a carrier has refused a shipment of the nature and kind it was its business to receive, and which it could have received at the point tendered without working a hardship or oppression, it is no defense for it to show that, for the reason of the consignee's blocking the freight yards at destination, an embargo had been placed by the railroad for shipments tendered to be forwarded to him there.

4. **Carriers of Goods—Embargo—Discrimination.**

A common carrier cannot place an embargo on its customer or patron so as to discriminate against him or those dealing with him, and for such unjust discrimination the carrier is indictable in this State. (Revisal, sec. 3749.)

5. **Carriers of Goods—Penalty Statutes—Refusal to Accept Freight—Constitutional Law—Interstate Commerce.**

A statute imposing a penalty on a common carrier for refusing to accept freight when tendered (Revisal, sec. 2631), and which gives it every available defense in court, is within the police powers of the State in enforcing the duties and liabilities of the carrier to its patrons, and is not void as an interference with interstate commerce, in the absence of inhibited congressional legislation or orders of the Interstate Commerce Commission made in pursuance thereof.

6. **Carriers of Goods—Penalty Statutes—Refusal to Accept Freight—Due Process—Defense—Reasonable Penalty—Constitutional Law—Interstate Commerce.**

When, in an action for the recovery of the penalty prescribed by the Revisal, sec. 2631, for the failure of shipment when tendered, every legal right of the carrier is safeguarded, as trial by jury, regular procedure, defense and appeal, and the penalty is not unreasonable or oppressive, the act does not contravene the provisions of the Federal Constitution in relation to interstate commerce or the Fourteenth Amendment.

ACTION tried before *Guion, J.,* and a jury, at September Term, 1908, of BUNCOMBE.

This action is instituted for the recovery of the penalty imposed by section 2631 of the Revisal, for failure to receive a car load of lumber tendered defendant by plaintiff at Black Mountain station, to be shipped to W. H. Westall, at Asheville, both points being within this State.

The facts, as stated in defendant's brief, are: Plaintiff had contracted to sell lumber, f. o. b. cars at Black Mountain, to Westall, at Asheville. Plaintiff hauled the lumber to Black Mountain, loaded it on cars, furnished by defendant 7 June, 1906, and demanded a bill of lading, which defendant's agent declined to give to him, upon the ground that an embargo had been placed upon shipments of lumber consigned to W. H. Westall and English & Co., at Asheville, on account of accumulation of business for them at that point. When the embargo against Westall was placed, there were many loaded cars on defendant's yard at Asheville for him, which he could not or would not handle, and this, with other conditions, created a congested condition of the Asheville yards and caused the embargo to be placed upon shipments to him. There was evidence tending to show that the defendant's yards and tracks at Asheville were congested by an unusual number of cars of freight which were left unloaded; that on 30 May, 1906, defendant's superintendent issued the following notice: "To all agents, Asheville Division: Until further notice, place embargo on all shipments of lumber consigned to ·W. H. Westall and English & Co., at Asheville, N. C., account accumulation of business for these people at Asheville." On 16 June the embargo against Westall was canceled.

There was evidence tending to show that, before and during the time of the embargo, defendant had on its yards and tracks at Asheville for Westall some eighteen or twenty cars of lumber—had more than could be placed on his tracks for unloading—and they occupied other tracks; that they congested the yard and occupied cars that defendant required to move other freight on the line. The traffic in the summer of 1906 was one-

third heavier than ever before. Plaintiff testified that he made several demands upon defendant's agent for a bill of lading, each of which was refused, until 20 June, 1906, when he gave him the bill and shipped the car.

The only issue submitted to the jury was directed to the number of days which defendant refused to receive the car load of lumber. Under instructions of his Honor the jury found a delay of "nine days, deducting two Sundays." His Honor rendered judgment for the penalty of $50 a day imposed by the statute, amounting to $450. Defendant excepted and appealed, assigning errors set out in the opinion.

*Craig, Martin & Winston* for plaintiff.
*W. B. Rodman, Moore & Rollins* and *R. G. Lucas* for defendant.

CONNOR, J. The exceptions to the rulings of his Honor are not very clearly stated in the record, but in the well-considered brief of defendant's counsel the questions argued before us are thus formulated:

1. "Was the defendant entitled to have its reasons and excuses for not issuing the bill of lading, on demand, considered by the jury?

2. "Can the plaintiff recover a penalty for each day of delay to ship without showing a daily renewal of the tender?

3. "Is the statute (Revisal, sec. 2631) void, (*a*) as a regulation of interstate commerce in conflict with Article I, section 8, clause 3, of the Constitution? (*b*) as being in conflict with the Fourteenth Amendment to the Federal Constitution?"

In discussing the first question we are uncertain whether his Honor was of the opinion that the statute imposed upon the defendant an absolute duty to receive plaintiff's lumber for shipment to Westall, and that no defense was open to it other than "the act of God or the public enemy," or whether, taking all of the evidence as true, it failed to show such a condition as excused the defendant from receiving the lumber for shipment to Westall. Having received the testimony, over plaintiff's objection, it would seem that his Honor was of the opinion that

no valid defense was established. As the construction of the statute has in this and other appeals been pressed upon our consideration, we think it well to discuss and decide it. Section 2631 provides that transportation companies, "whose duty it is to receive freight for shipment" shall, for refusing to receive all freight "whenever tendered" to its agent, etc., forfeit and pay a penalty of $50 for each day it refuses to receive said freight, together with actual damages sustained. The freight must be tendered at a regular depot and within business hours. *Alsop v. Express Co.,* 104 N. C., 278. It is well settled that when statutes give new and additional remedies for the enforcement of rights and duties given or imposed by the common law, unless a contrary intention is manifested, the courts will not assume that the Legislature intended to enlarge or modify the common-law right or duty. This, we think, is illustrated by the decisions of this Court. In *Branch v. Railroad,* 77 N. C., 347, the first case in which a statute imposing a penalty upon a common carrier came before the Court, it was insisted by the defendant that, although the language of the statute was imperative and contained no exonerating or excusing exceptions, it was open to the defendant to show that conditions existed which excused it from performance of the duty and liability for the penalty. The statute (Acts 1874-'75; The Code, 1883, sec. 1967) imposed a penalty of $25 a day for "permitting freight to remain unshipped for more than five days, unless otherwise agreed." *Mr. Justice Rodman,* in an able opinion, held that "The act does not supersede or alter the duty or liability of the company at common law. The penalty in the case provided for is superadded. The act merely enforces an admitted duty." He further says that it was not necessary to decide whether "any excuse, short of the act of God or the king's enemies, would suffice," because "the excuse offered was insufficient." He proceeded, however, to discuss the reasons assigned for not discharging the duty, and concludes that the conditions which were shown "were brought about by its own acts in inducing large shipments from points beyond its southern terminus." The defendant was an intrastate road. In *Keeter v. Railroad,* 86 N. C., 346, defendant showed that there was an accumulation of cars at its depot at

Halifax, N. C. The Court, without discussing the question, said that the excuse was insufficient, citing *Branch's case, supra.* It did not appear how the conditions at Halifax were brought about. The Court disposed of the question by saying that "It was the duty of defendant to provide cars for the transportation of all the freight delivered." This language indicated the opinion that the duty was absolute and that no excuse could be heard to avoid the recovery of the penalty, when it was not discharged. At the next term *Whitehead v. Railroad,* 87 N. C., 255, was before the Court. The conditions urged by defendant as an excuse for failing to ship within five days were found by the Superior Court and set out upon the record. Plaintiff relied upon the language used in *Keeter's case, supra. Ashe, J.,* who wrote the opinion in this case, said : "It may be well to observe that the Court did not go into the discussion of that question," because the delay did not go beyond five days. The learned and always candid Justice said : "The Court could not have intended to hold that there could be no excuse when it was citing *Branch's case* with approval, in which it is conceded that excuses may be admitted." After discussing the facts found by the judge, he concludes : "The delay in making the shipment, then, it seems, has not been caused by any act of negligence or default on the part of the defendant, but resulted from the concurrence of circumstances entirely beyond its control." *Smith, C. J.,* in a concurring opinion, after citing authorities holding that exonerating conditions may be shown, says : "This seems to me a just view of the carrier's liability at common law; and the statute, as this Court declares in the case cited, does not enlarge or extend the obligation, but merely provides an additional method of enforcing it." *Justice Ruffin* dissented from the conclusion reached, in regard to the sufficiency of the conditions shown, to excuse defendant from discharging the duty, but concurred that the statute created no new duty and that conditions could be shown in excuse. He said that the effect of the statute was not to enlarge a common-law duty, but "is intended simply to enforce an admitted duty." In regard to the conditions which would, in his opinion, be held sufficient to excuse the carrier, he says : "Nothing short of that diligence

which would acquit the defendant of his common-law duty and liability should be allowed to exonerate it from the penalty prescribed by the statute." We conclude from these decisions, sustained by reason, that when the carrier shows the existence of conditions for which it is not responsible, preventing or rendering impossible the discharge of the duty, it will not be liable for the penalty. The principle, which commends itself to us as just, is thus stated by *Judge Ashe:* "When the facts show that, by force of circumstances for which it was in no way responsible, the carrier was disabled from performing the duty imposed by the statute, it would be unjust to punish it for failing to comply with its requirements." Keeping this principle in view, the validity of the claim for excuse or exoneration must depend very largely upon the facts in each case as they are presented. While the policy of the legislation which has for its object the enforcement of the performance of the duty to the public by transportation companies should be sustained, the statutes should be so construed and enforced as to advance the remedy and suppress the evil without at the same time becoming harsh, unjust and oppressive. When a new and additional duty is imposed by the statute we can see no reason why the same principle should not prevail. It is an elementary rule in the construction of statutes that the court will not attribute to the Legislature the intention to punish the failure to do an impossible thing. "No text imposing obligations is understood to demand impossible things." *Walker v. Railroad,* 137 N. C., 163; *Stone v. Railroad,* 144 N. C., 226. "Acts of Parliament are to be so construed as no man that is innocent or free from injury or wrong be by a literal construction punished or endangered." *Pier Co. v. Hannam,* 3 Barn. and Ald., 266. The court should enforce the legislative will, as expressed in the statute, remembering "The letter killeth while the spirit giveth life." The validity of statutes enacted for the purpose of compelling common carriers to discharge their duty to the public by the imposition of penalties has been in some instances successfully attacked by reason of harsh and literal construction given them by the court. This is illustrated by the case of *Railroad v. Mayes,* 201 U. S., 321, strongly urged upon our

attention in this and other cases. The statute of Texas, upon which that decision is based, required the carrier, upon demand, to furnish cars. No excuse was named in the statute, other "than strikes or other public calamities." The Texas Court held that the duty was imperative and no other excuse than that named in the statute could be heard for failure to comply with the demand for cars. The validity of the statute was called into question upon a writ of error from the Supreme Court of the United States. It was insisted that the statute violated the commerce clause of the Constitution, as is contended by defendant in this case. *Justice Brown* said: "An absolute requirement that a railroad shall furnish a certain number of cars on a specified day, regardless of every consideration except strikes and other public calamities, transcends the police powers of the State and amounts to a burden upon interstate commerce." In *Railroad v. Loving,* 98 S. W. Rep., 450, the Court of Civil Appeals held that the duty imposed by the statute was imperative. This Court has never so held. The principle announced in *Branch's case, supra,* and approved in the other cases cited, has never been called into question. In *Stone's case, supra,* we said: "We should be slow to find in the language of a statute the imposition of a penalty for the omission to perform a duty, the standard of which is fixed by the law, which did not, either in terms or by necessary intendment, except from its operation causes which a high degree of foresight and precaution could not anticipate or prevent." In *Alsop v. Express Co.,* 104 N. C., 278, it was held, in an able and well-sustained opinion by *Mr. Justice Avery,* that the act of 1879 (Revisal, sec. 2631) enlarged the common-law duty of common carriers to receive all freight tendered them for shipment by requiring them to do so "whenever tendered." In other words, the statute prescribes what is the reasonable time within which they must perform the duty—receive the freight. It must be tendered at a regular depot and during business hours. *Alsop's case, supra.* While, both at common law and with the superadded duty imposed by the statute, the carrier must receive the freight whenever tendered, yet, upon the authority of the cases cited, if it is shown that by reason of controlling conditions for which the carrier is not

responsible, such as the destruction by fire of warehouses, wharfs, platforms, tracks, etc., before a reasonable time to rebuild has elapsed or the unexpected tendering of an extraordinary quantity of freight at a depot, and probably other unforeseen causes, the duty cannot be performed, it would not be liable for the penalty. It is not practicable in the discussion of this appeal to do more than apply these general principles to the facts in the case.

This brings us to a consideration of the defense offered by defendant as an excuse for not receiving plaintiff's freight. Do they establish or tend to establish any valid, legal excuse? While plaintiff was permitted to place the lumber on the car at Black Mountain, it is conceded that defendant refused to receive it for shipment or to issue a bill of lading for it. This was a refusal to receive. *Twitty v. Railroad,* 141 N. C., 355. It is not suggested that any conditions existed at Black Mountain which prevented defendant from receiving for shipment all freight tendered, or that it did not have the necessary cars for the purpose of transporting, or that the track was obstructed. For any and all other persons except Westall and English & Co. the defendant was ready and able to perform its duty to receive freight for shipment. It will be observed that the plaintiff had contracted to sell the lumber and deliver to Westall f. o. b.; hence the defendant, upon receipt of the lumber, would have owed no further duty to plaintiff. For any delay in transporting and delivering within a reasonable time, as prescribed by the statute, defendant would have been liable to Westall. The defense, then, comes to this: Conditions at Asheville, to which Westall contributed by failing to unload and remove freight consigned to him, congested defendant's yards and tracks, kept cars "tied up" and prevented it from discharging its duty to other members of the public who might demand its services. We do not think that these conditions excused defendant from performing its duty to plaintiff at Black Mountain. If on account of the conditions existing at Asheville the cars could not be carried there and unloaded, the defendant should have provided reasonable facilities for caring for the freight at Black Mountain until it could transport it. It will be observed that the duty to receive

freight is confined to such as is "of the nature and kind received" by such carrier. This relieves the defendant from all unreasonable demands in respect to the character of freight which may be tendered it. When .it is remembered that, in addition· to these protective provisions, the defense is open to the carrier that unforeseen, unexpected conditions not to be anticipated may be successfully urged as a defense, we do not perceive that any harsh or oppressive measure of duty is imposed upon the carrier. In the case of *Railroad v. Mayes, supra,* so strongly urged upon our attention by counsel, *Justice Brown* says that there is much to be said in favor of laws compelling railroads to furnish adequate facilities for the transportation of both freight and passengers, etc. We entirely concur with the learned Judge when he further says: "While railroad companies may be bound to furnish sufficient cars for their usual and ordinary traffic, cases will inevitably arise, by reason of an unexpected turn in the market, a great public gathering or an unforeseen rush of travel or pressure upon the road for transportation facilities, which good management and a desire to fulfill all its legal requirements cannot provide for." None of the conditions which are suggested are presented in this case, so far as receiving the freight is concerned. It was tendered at the proper place, at the proper time; was of the nature and kind which defendant shipped; the cars necessary for receiving were at the depot; there was no obstruction of the track or shortage of motive power or labor. The only reason assigned was that Westall, by refusing to unload cars consigned to him at Asheville, contributed to the congestion of the yard and tracks at Asheville. In other words, defendant refused to discharge its duty to plaintiff because Westall refused to discharge his duty to defendant at Asheville. We cannot think this a valid excuse.

We do not intimate that defendant has any right to issue an embargo upon one or more of its customers or patrons and refuse to carry or receive any freight for him. To permit this to be done would empower the carrier to discriminate, not only against him, but against other persons from dealing with him. It is a fundamental principle of the common law enforced by statutes and made indictable in this State for a common carrier to un-

justly discriminate between members of the public. Revisal,
sec. 3749. It must serve all alike, under the same circum-
stances. The purpose of the law is the "prevention of unjust
discrimination, or, to put the proposition affirmatively, to secure
to every person constituting a part of the public an equal and
impartial participation in the use of the facilities which the
carrier is capable of affording and which it is its duty to afford."
*Lumber Co. v. Railroad,* 141 N. C., 171. *Mr. Justice Brewer,*
in *Railroad v. Lumber Mills,* 211 U. S., 612, says: "While no
one is compelled to engage in the business of a common carrier,
yet, when he does so, certain duties are imposed which can be
enforced by *mandamus* or other suitable remedy. The Missouri
Pacific Railway engaged in the business of transferring cars
from the Santa Fe track to industries located at Stratford, and
continued to do so for all parties except the mill company. So
long as it engaged in such transfer it was bound to treat all
industries at Stratford alike, and could not refuse to do for one
that which it was doing for others. No legislative enactment,
no special mandate from any commission or other administra-
tive board was necessary, for the duty arose from the fact that
it was a common carrier. This lies at the foundation of the
law of common carriers." After further discussion, the learned
Justice concludes: "Indeed, all these questions are disposed of
by one well-established proposition, and that is: that a party
engaging in the business of a common carrier is bound to treat
all shippers alike, and can be compelled to do so by *mandamus*
or other proper writ." In no possible form can this funda-
mental truth be evaded. It is a "thing fixed" in the common
law, enforced by both common-law and statutory remedies, its
violation denounced as criminal and subjected to severe punish-
ment. We cannot permit any departure from it, however per-
suasive the reasons assigned may be for doing so. On the other
hand, we do not wish to be understood as intimating that one
or more patrons of a common carrier may, by refusing or failing
to receive freight consigned to him, so monopolize the car tracks,
etc., as to prevent or interfere with it in the discharge of its
duty to the public. The statute enacted for the enforcement
of the duties of common carriers, imposing penalties, are not

intended to simply penalize railroads, but to secure prompt, efficient service to all and not a favored few. The patrons owe duties to carriers and to other patrons. Reasonable rules and regulations may be made, either by the railroads or the Corporation Commission, to enforce these relative rights and duties.

The evidence shows that at a time when all of the railroads and the people were confronted with an unusual condition in regard to the transportation of freight Westall permitted eighteen or twenty cars loaded with lumber to stand upon the defendant's tracks at Asheville. How far this conduct would have been a valid defense to an action brought by him for penalties for failing to transport and deliver freight is not presented in this case. The Corporation Commission has made rules and imposed penalties for their enforcement in regard to unloading cars. If they are not sufficiently stringent and the penalties not sufficiently large to protect the roads and their patrons from congested yards and tracks, we have no doubt the commission will make them so. We cannot weaken the principles of the common law, founded in wisdom and justified by experience, nor construe away the plain provisions of statutes to accomplish this end. If the enforcement of these statutes in some instances work hard results, the appeal must be made to the General Assembly for their modification. We cannot think it improper to express the hope that a clear recognition by those who manage railroads, and by those who use them, of their respective rights and duties will remove much of the friction which has resulted in the statutes enacted by our Legislature.

The defendant next urges that the penalty of $50 for each day the said company refuses to receive said shipment can be recovered only when a tender is made on each day. We cannot concur in this view. The plaintiff hauled his lumber to the defendant's regular depot and, with its consent, placed it upon the car, demanding a bill of lading, which was refused. Plaintiff says that he went to the agent two or three times and asked if he had shipped it, and he said that he had not. He wanted plaintiff to unload the car, which he refused to do. The agent said that he was holding the car at plaintiff's expense. Plaintiff explains how, by reason of the refusal to ship the lumber, he was compelled to cancel other orders which he had accepted

from Westall—was compelled to stop sawing, his only occupation, etc. To require the plaintiff to haul the lumber home and return it to the depot each day, or to go through the empty form of making a constructive tender, imposes either an unwarranted hardship or savors of trifling with a man's substantial rights. The plaintiff left the lumber on the car, with a standing tender and demand that it be shipped. This was well understood by the defendant's agent when, on 18 June, 1906, without any other reason than that the embargo was raised, he shipped it. It is not shown that conditions at Asheville had changed on that day. If plaintiff had removed his lumber on the refusal to ship—hauled it away—of course, he could claim only for the day when it was tendered; but he made his "tender good" each day and at all hours of the day. The statute would be of little value as a remedy for an existing evil if the narrow construction is given it as contended by defendant. The Legislature evidently intended to impose a penalty for each day upon which the freight was at the depot ready for shipment. If the freight tendered were bales of cotton, hogsheads of tobacco, or other heavy, bulky articles, it would be impracticable to haul and rehaul it to defendant's depot each day. While penal statutes are to be construed strictly as against the party against whom they are enforced, they are not to be so construed as to make them of no force and effect. Upon the defendant's evidence the tender was made on 7 June, and kept good until the lumber was shipped on 18 June. Each day's delay in shipping was "a refusal to ship," within the meaning of the statute.

Defendant contends that the statute is a regulation of interstate commerce and violates the Constitution of the United States. The proposition is founded upon the decision in *Railroad v. Mayes, supra.* In that case the demand was for cars to ship cattle beyond the State. Here the point from which the lumber was to be shipped and its destination were both within the State. Defendant's contention is that, while this is true, as it is an interstate road, engaged in interstate commerce, if it is compelled to receive all freight whenever tendered, it will be prevented from discharging its duty to its patrons engaged in interstate commerce. To state the contention in the words of defendant's

### GARRISON *v.* RAILROAD.

brief, "The statute, if enforced, would interfere with interstate commerce, in that it would require the defendant, under heavy penalties, excessive and unreasonable, to give preference to intrastate shipments." The contention is also made that "the statute, in terms, includes freight tendered for both interstate and intrastate shipments," and that this Court has in several cases applied this and similar statutes to interstate shipments.

Passing the question whether, in the absence of any suggestion that to receive plaintiff's lumber when tendered in the slightest degree interfered with the duty of defendant to its interstate business, it is in a position to raise the question in this appeal, we think it well to examine the contention and decide it. *St. George v. Hardie,* 147 N. C., 88. In *Mayes' case* we find that, after holding that, as construed by the Supreme Court of Texas, the statute was imperative, making no allowance for defenses, and that it "transcended the police power of the State and amounted to a burden upon interstate commerce," the opinion concludes: "We think that sufficient allowance is not made for the practical difficulties in the administration of the law, and that, *as applied to interstate commerce,* it transcends the legitimate power of the Legislature." We hold that, upon well-settled rules of construction, proper allowance is made for the difficulties suggested by *Judge Brown.* In this case the statute is not applied to interstate commerce. The case of *Railroad v. Lumber Mills, supra,* is instructive upon the question presented here. There the mill company applied to the Supreme Court of Kansas for an alternative writ of *mandamus* compelling the railway company to make provisions for the transfer of cars between the lines of the Santa Fe company and the mill and elevators of the plaintiff. *Mr. Justice Brewer* thus states the contention involving the question presented in this appeal: "The Missouri Pacific and the Santa Fe railroads are common carriers, engaged in interstate commerce, and, as such, are subject to the control of Congress and, therefore, in these respects, not amenable to the power of the State. It appears from the findings that about three-fifths of the flour of the mill company is shipped out of the State, while the other two-fifths are shipped to points within the State. In addition, the hauling of the

empty cars from the Santa Fe track to the mill was, if com-
merce at all, commerce within the State. ·The roads are there-
fore engaged in both interstate commerce and that within the
State. In the former they are subject to the regulation of
Congress; in the latter, to that of the State; and to enforce the
proper relation between Congress and the State the full control
of each over the commerce subject to its dominion must be pre-
served. How the separateness of control is to be accomplished
it is unnecessary to determine. Its existence is recognized in
the first section of the interstate-commerce act: "That the pro-
visions of this act shall not apply to the transportation of pas-
sengers or property, or to the receiving, delivering, storage or
handling of property wholly within one State, and not shipped
to or from a foreign country, from or to any State or Territory,
as aforesaid." The following language is quoted with approval
from the opinion of *Mr. Justice Brown* in *Railroad v. Illinois,*
177 U. S., 514: "Few classes of cases have become more common
of recent years than those wherein the police power of the State
over the vehicles of interstate commerce has been drawn in
question. That such power exists and will be enforced, notwith-
standing the constitutional authority of Congress to regulate
such commerce, is evident from the large number of cases in
which we have sustained the validity of local laws designed to ·
secure the safety and comfort of passengers, employees, persons
crossing railway tracks, and adjacent property owners, as well
as other regulations intended for the public good." A number
of cases are cited in which State laws, such as those requiring
engineers to be examined with respect to their ability to dis-
tinguish colors *(Railroad v. Alabama,* 128 U. S., 96); requiring
telegraph companies to receive dispatches, to transmit and de-
liver them with due diligence, as applied to messages outside
the State *(James v. Telegraph Co.,* 162 U. S., 650); forbidding
running freight trains on Sunday *(Hennington v. Georgia,* 163
U. S., 299); requiring railway companies to fix their rates annu-
ally for the transmission of passengers and freight, and to post
a printed copy at stations *(Railroad v. Fuller,* 17 Wall., 560);
regulating the heating of passenger cars and directing guards
and guardposts to be placed on bridges and trestles *(Railroad v.*

*New York,* 165 U. S., 628), and others, in regard to which it is said: "In none of these cases was it thought that the regulations were unreasonable or operated in any just sense as a restriction upon interstate commerce." *Mr. Justice Hoke,* in *Morris · v. Express Co.,* 146 N. C., 167, has discussed the same question as it applies to section 2634 of the Revisal, citing the same line of authorities. In that section the penalty is imposed for failing to adjust and pay a valid claim for damages sustained to goods shipped from another State. See, also, *Porter v. Railroad,* 63 S. C., 169.

Without extending this discussion further, we find in the decisions of the Supreme Court of the United States the principle uniformly announced and enforced, that "until specific action by Congress or the commission, the control of the State over these incidental matters remains undisturbed." It is not claimed that either · Congress, directly or through the Interstate Commerce Commission, has enacted any statute or made any rule with which the statute conflicts or interferes. Of course, neither has any power, by statute or rule, to enforce the duty of carriers to receive or transport all intrastate shipments; hence it must follow that if the State cannot do so because possibly its enforcement may indirectly affect interstate commerce, they may receive and transport such freight at such times as suits their convenience or pleasure, free from any control whatever. It would work a strange result if the State has lost so essential an element of her police power without surrendering it to the Federal Government—that it is not lodged in either Government. It is not denied that the State must exercise the police power in subordination to the power which she has conferred upon the Federal Government to regulate interstate commerce, and all statutes are to be construed and applied in the light of this fact. The law in this respect is thus stated by *Justice Matthews* in *Smith v. Alabama,* 124 U. S., 465: "There are many cases where the acknowledged powers of a State may be exerted and applied in such a manner as to affect foreign or interstate commerce without being intended to operate as commercial regulations. If their operation and application in such cases regulate such commerce, so as to conflict with the regulation of the same

subject by Congress, either as expressed in positive laws or implied from the absence of legislation, such· legislation on the part of the State, *to the extent of that conflict,* must be regarded as annulled.   *   *   *   A carrier exercising his' calling within a particular State, although engaged in interstate commerce, is answerable according to the laws of the State for acts of non-feasance or misfeasance committed within its limits.   If he fail to deliver goods to the proper consignee at the right time or place, he is liable in an action for damages, under the laws of the State, in its courts; or if by negligence in transportation he inflicts injury upon the person of a passenger brought from another State, a right of action is given him by the local laws. In neither case would it be a defense that the law giving him the right to redress was void as being an unconstitutional regulation of commerce by the State.   If it is competent for the State to administer justice according to its own laws for wrongs done and injuries suffered, when committed and inflicted by defendants while engaged in the business of interstate or foreign commerce, notwithstanding the power over those subjects conferred upon Congress by the Constitution, what is there to forbid the State, in the further exercise of the same jurisdiction, to prescribe the precautions and safeguards foreseen to be necessary and proper to prevent by anticipation those wrongs and injuries which, after they have been inflicted, it is admitted the State has the power to redress and punish?"   *Sherlock v. Alling,* 93 U. S. 99; *Plumley v. Massachusetts,* 155 U. S., 155.   In *Railroad v. Kentucky* it is said: "It has never been supposed that the dominant power of Congress over interstate commerce took from the States the power of legislation with respect to the instruments of such commerce, so far as the legislation was within its ordinary police powers."

Discussing the same objection to a statute enacted by the Legislature in Ohio requiring a road engaged in interstate commerce to run three trains a day each way, and to stop at a certain class of stations, *Justice Harlan,* in an able and vigorous opinion, said: "We perceive in the legislation of Ohio no basis for the contention that the State has invaded the domain of national authority or impaired any right secured by the national

Constitution. * * * The State of Ohio, by the statute in question, has done nothing more than to so regulate the use of a public highway, established and maintained under its authority, as will reasonably promote the public convenience. It has not unreasonably obstructed freedom of commerce among the States. Its regulations apply equally to domestic and interstate railroads. Its statute is not directed against interstate commerce, but only incidentally affects it." Calvert on Interstate Com., 159.

It is said that we have held that the statute applies to interstate shipments. In *Bagg v. Railroad,* 109 N. C., 279, it was held that the statute of 1874-'75 (section 1967, The Code of 1883) applied to an interstate shipment because it was in aid of commerce. The discussion by *Mr. Justice Avery* is full and satisfactory. *Currie's case,* 135 N. C., 535, was decided upon the authority of *Bagg's case. Walker's case,* 137 N. C., 168, and *Twitty's case,* 141 N. C., 355, were intrastate shipments. In *Harrell's case,* 144 N. C., 532, the transportation was completed and the action was for the recovery of the penalty for refusing to deliver freight. Revisal, sec. 2533. In *Reid v. Railroad,* 149 N. C., 423, the shipment was beyond the limits of the State. We do not think that, in the light of the authorities, it is material whether the shipment is interstate or, as in this case, intrastate. We do not doubt that if in either case it was shown that the enforcement of the statute interfered with or prevented the carrier from discharging its duties in regard to interstate commerce or meeting any demand imposed upon it by an act of Congress or a rule of the Corporation Commission, such condition would constitute a valid defense to an action for the penalty imposed by the statute." This result does not invalidate the statute, but affects its enforcement by introducing an additional excuse for nonperformance. We do not understand how the enforcement of the statute gives preference to intrastate shipments. The construction which we have given it has the opposite result. What was said in *Branch's case, supra,* applies only to an intrastate road which did not come under the control of Congress or its agencies.

After an anxious consideration of the very full briefs and the authorities cited, we are unable to concur with the defend-

ant that the enforcement of the statute regulates or interferes with interstate commerce, nor do we see how, under the conditions existing at Asheville, N. C., the receipt for shipment of plaintiff's lumber at Black Mountain, N. C., could directly or indirectly affect its duty to the public as an interstate carrier.

But defendant urges that the statute is harsh and oppressive—takes its property without due process of law, and therefore violates the Fourteenth Amendment. The power of the State to impose penalties upon carriers for failure to discharge public duties is not denied. *Branch's case, supra; Stone v. Railroad, supra.* The same contention was made in *Railroad v. Emmons,* 149 U. S., 364, to an action based upon a statute requiring railroads to maintain fences and, for a failure to do so, subjecting them, in case of litigation, to treble damages. The Court said: "The answer to this is that there is no inhibition upon a State to impose such penalties for disregard of its police regulations as will insure prompt obedience to their requirements,    *    *    * and the extent of the penalties which should be imposed by the State for any disregard of its legislation in that respect is a matter entirely within its control. It was not essential that the penalty should be confined to damages for the actual loss to the owner of cattle injured by the want of fences and guards." Speaking for myself, I do not doubt that, under the constitutional prohibition against the imposition of excessive fines and cruel and unusual punishments, as well as the protective provisions of the State and Federal Constitutions securing life and property against governmental invasion, except by the "law of the land," the Court has the power and, in a clear case, it would be its duty to declare invalid a statute imposing penalties so enormous in amount and out of proportion to the gravity of the offense and its effect upon private and public interest as to come within the inhibition of the Constitution. I could never assent to the proposition that by legislative enactment a person, either natural or corporate, could be destroyed and its property taken by the imposition of excessive and unusual penalties, leaving no power of prevention in the judicial department of the Government. I think that the correct limitation upon legislation of this character is stated by *Mr. Justice Peckham* in *Ex parte*

150—38

*Young,* 209 U. S., 123. If the penalties are so enormous that the person upon whom they are imposed is prevented from resorting to the courts to determine the validity of the statute— that is, that an unsuccessful effort to do so would work their destruction—they are invalid. No such result could follow the enforcement of the statute under consideration. While it may be that in some cases the penalty imposed may be large, as compared with the value of the property involved or the actual damage sustained, yet, as in the case before us, the refusal to receive freight may work serious injury, destructive of the business of the party aggrieved. The plaintiff was engaged in operating a sawmill, cutting and selling lumber for sale in other markets. He had contracted to sell to Westall other car loads of lumber, which, by reason of the refusal of the defendant to receive for shipment, Westall refused to take; he "had to shut down his mill for months." It is not difficult to see what disastrous results would naturally follow to plaintiff from the refusal of defendant to discharge its duty; and yet in an action for damages it would be difficult for him to recover full compensation for such injury. It is to compel obedience to its manifest duty and protect the public from just such results that penalties are imposed upon the carrier. We do not find in the amount of the penalty any ground for questioning the validity of the statute as violating any provision of either the State or Federal Constitution. In regard to the remedy prescribed for its enforcement, every legal right of the defendant is safeguarded. The penalty can be recovered only by an action in a court of competent jurisdiction, in which trial by jury, regular procedure and the right to appeal is secured. The statutory presumptions are made to relieve the plaintiff from proving his case. It may be, and doubtless is, sometimes difficult for those engaged in the management of railroads to meet and discharge all of the duties imposed upon them. We venture to hope that, with a clear understanding of the relative rights and duties of carriers and the public, more satisfactory business relations will prevail. We have discussed the questions presented upon this record at more than usual length because several appeals are pending in the Court in which they are involved. Upon a careful consideration of the entire record we find

No Error.