## MISSOURI PACIFIC RAILWAY COMPANY *v.* LARABEE FLOUR MILLS COMPANY.

### ERROR TO THE SUPREME COURT OF THE STATE OF KANSAS.

No. 16.   Argued November 11, 12, 1908.—Decided January 11, 1909.

No one can be compelled to engage in the business of a common carrier, but if he does so, he becomes subject to the duties imposed on common carriers.

Even in the absence of legislative enactment or special contract a common carrier is bound to treat all shippers alike and can be compelled to perform this common-law duty by mandamus or other proper writ.

Notwithstanding the creation of the Interstate Commerce Commission, and the delegation to it by Congress of the control of certain matters, a State may, in the absence of express action by Congress or by such commission, regulate for the benefit of its citizens local matters indirectly affecting interstate commerce.

Where there has been no action by Congress or the Interstate Commerce Commission a state court may by mandamus compel a railroad company doing interstate business to afford equal local switching service to its shippers, notwithstanding the cars in regard to which the service is claimed are eventually to be engaged in interstate commerce.  *McNeill* v. *Southern Railway Co.*, 202 U. S. 543, distinguished.

On September 15, 1906, the Larabee Flour Mills Company (hereinafter called the mill company) filed its application in the Supreme Court of Kansas for an alternative writ of mandamus, compelling the Missouri Pacific Railway Company (hereinafter called the Missouri Pacific) to restore, resume and make transfer of cars between the lines of the Atchison, Topeka and Santa Fe Railway Company (hereinafter called the Santa Fe) and the mill and elevators of the plaintiff, situated in the town of Stafford.  The following diagram shows the location of the mill and railroad tracks:

Line "A" represents the main line of the Santa Fe Railway Company; line "B" the main line of the Missouri Pacific Railway Company; line "C" the transfer track owned by the Santa Fe Company; "D" the mill of the Larabee company; "E" the spur track running from the main line of the Missouri Pacific Railway Company. The distance from "F" to "G" on the main line of the Missouri Pacific Railway Company is about one mile.

Upon the filing of this application and the answer and return of the Missouri Pacific the matter was referred to a commissioner, who reported his findings of fact, which, so far as are material to the questions presented, are as follows: Stafford is a flourishing town of 1,600 people, situated in the midst of a wheat-growing district of the State. The mill company has for more than four years been operating a flouring mill of 1,000 barrels daily capacity. About three-fifths of its product is shipped out of the State of Kansas into other States and the remaining two-fifths to points within the State. It receives a large portion of its grain in carload lots over the two roads.

The Missouri Valley Car Service and Storage Association (hereinafter called the car service association) is an unincorporated voluntary association of a number of railroad companies, having a manager and other employés. The object and the duty of this association is to represent and protect the interest and enforce the rights of the members thereof in the interchange of freight cars, the prompt loading, unloading and return of cars interchanged, or delivered to shippers, for traffic purposes. It had been in operation for many years, commencing prior to any of the transactions mentioned in this litigation. Its objects, operations and methods were generally understood by commercial shippers and acquiesced in as appropriate for securing to the shipping public the greatest amount of service over the roads composing it.

No express contract existed between the two railroad companies requiring either to use or to permit the other to use the transfer track, or requiring either to place empty or loaded cars

thereon to be taken away or returned by the other. Whenever the Santa Fe placed its empty cars for the mill company on the transfer track, the Missouri Pacific, upon notice thereof, hauled and delivered them at the mill on the siding connecting it with the Missouri Pacific. The Santa Fe and the Missouri Pacific both held themselves out as ready to do such and like transferring, and continued to do so after the controversy arose in this case for all industries located on the Missouri Pacific at Stafford, making carload shipments in or out over the Santa Fe, except the mill company. A controversy arose between the Missouri Pacific and the mill company as to two charges for demurrage; one for demurrage between December 12, 1905, and April 26, 1906, and the other between July 24 and August 14, 1906. Payment of both was demanded by the car service association. One of them, the mill company, offered to pay; the other it refused, on the ground that the delay and detention were not caused by its fault but by the defective, insufficient and inadequate service of the Missouri Pacific in placing the cars for unloading and reloading. For a failure to pay both these charges the Missouri Pacific, by the direction of the car service association, ceased and refused to make further delivery to the mill company of empty cars placed on the transfer track for the use of the mill company by the Santa Fe, in consequence of which the mill company, when desiring to ship any of its products from Stafford by the Santa Fe, was compelled to haul the same in wagons from its mill to the station of the Santa Fe and there load into cars. This entailed upon the mill company great inconvenience and additional expense in the management of its business. The refusal of the Missouri Pacific was based solely upon the ground above stated, and not upon a claim that the compensation paid for the service was unsatisfactory, or that the service constituted a part of interstate commerce, or that the Missouri Pacific did not undertake to perform services of such character.

The commissioner also found that the detention of the cars on account of which the demurrage charge was refused payment

by the mill company was caused as much by the defective motive power and insufficient train service of the Missouri Pacific as from any fault or omission on the part of the mill company.

The case coming on for hearing before the Supreme Court of the State a peremptory writ of mandamus was ordered, commanding the Missouri Pacific to immediately resume the transfer and return of cars loaded and unloaded from the line of the Santa Fe to and from the mill and elevator at the station and city of Stafford, upon the request and demand of the mill company, and upon payment of the theretofore customary charges.

*Mr. Balie P. Waggener* for plaintiff in error:

The referee finds that the mill company ships from its mill over these two roads substantially its entire product, three-fifths of which is so shipped out of the State of Kansas, and into other States, etc. The same was interstate commerce, and beyond and not within the regulatory power of the State or the state court.

In the performance of this service for the Santa Fe company, the Missouri Pacific Railway Company was acting as a connecting carrier, or as the agent of the Santa Fe company. In no sense was it the agent of the mill company, performing for it a local service. As disclosed by the admissions of the mill company in its application for the writ, the empty cars were furnished by the Santa Fe company to the mill, to be there loaded; and three-fifths of all such cars so loaded were shipped from the mill out of the State. There was here no separation in fact between that which was wholly interstate and that which was wholly intrastate. *Johnson* v. *So. Pac. Co.*, 192 U. S. 21, 22; *McNeill* v. *Southern Ry. Co.*, 202 U. S. 562; *Central Stock Yards* v. *L. & N. R. R. Co.*, 92 U. S. 570; *Rhodes* v. *Iowa*, 170 U. S. 412.

The shipments in question were under the exclusive control of the provisions and requirements of the Interstate Commerce Act. *Railway Co.* v. *I. C. C.*, 162 U. S. 940; *United States* v. *Terminal Co.*, 144 U. S. 863; *United States* v. *C. & N. W. R. R. Co.*,

157 Fed. Rep. 323, and cases there cited; *Johnson* v. *Southern Pac. Ry.*, 196 U. S. 22.

The railroad tracks, spurs, switches, terminals, depots and yards of the Santa Fe and Missouri Pacific companies at Stafford were instrumentalities of interstate commerce, and as such the regulation and control thereof vested exclusively in the Interstate Commerce Commission. The judgment of the state court is necessarily a regulation, not only of interstate commerce, but the instrumentalities of interstate commerce, within the meaning of the Federal Constitution. *Railway Co.* v. *I. C. C.*, 162 U. S. 211; Hepburn Act, §§ 1, 23 &c.; *Gibbons* v. *Ogden,* 9 Wheat. 1; *Hall* v. *De Cuir,* 95 U. S. 489; *Lottery Cases,* 188 U. S. 346, 375; *Dining Car Case,* 196 U. S. 21, 22; *Welton* v. *The State,* 91 U. S. 280; *Pensacola Tel. Co.* v. *W. U. Tel. Co.*, 96 U. S. 9.

The whole subject-matter is fully covered by and included in the legislation of Congress, in its attempt to make laws "necessary and proper for carrying into execution" the express power "to regulate commerce with foreign nations, and among the several States, etc." These powers, having been "delegated to the United States by the Constitution," are exclusive of the States. In every conceivable way has Congress, by supplemental legislation, broadened and extended the scope and purpose of the original act to regulate commerce, and this court has given its approval of such legislation in the case of *Schlemmer* v. *Railway Co.*, 205 U. S. 1, and *Johnson* v. *Southern Pac. Ry. Co.*, 196 U. S. 1. See also *I. C. C.* v. *C. G. W. Ry. Co.*, 209 U. S. 108, 123.

*Mr. Joseph G. Waters* and *Mr. Charles Blood Smith*, with whom *Mr. W. H. Rossington, Mr. Clad Hamilton, Mr. John F. Switzer* and *Mr. John C. Waters* were on the brief, for defendant in error:

The findings show that the service affected by the state court's judgment is purely local and intrastate. The placing of empty cars at the mill for loading by the milling company

and the returning the same, when loaded, to the Santa Fe switch. is purely a local facility whereby haulage between the two railroads is obviated.

Although a railroad company may be largely engaged in interstate commerce, it is amenable to state regulation and taxation as to any of its service which is wholly performed within the State and not as a part of interstate commerce. *Penna. R. R. Co.* v. *Knight*, 192 U. S. 21; *Coe* v. *Errol*, 116 U. S. 517; *Diamond Match Co.* v. *Ontonagon*, 188 U. S. 84; *I. C. C.* v. *D., M. & G. H. Ry. Co.*, 167 U. S. 633; *G., C. & S. F. R. R. Co.* v. *Texas*, 204 U. S. 403.

The judgment of the state court is not a regulation of interstate commerce within the meaning of the Federal Constitution. *W. & M. & P. R. R. Co.* v. *Jacobson*, 179 U. S. 287; *Hopkins* v. *United States*, 171 U. S. 578.

The Hepburn Act does not operate to withdraw all interstate railroads from state control, and if such were its effect it would be in conflict with numerous decisions of this court. *Gibbons* v. *Ogden*, 9 Wheat. 194, 195; *Passenger Cases*, 7 How. 400; *Sinnott* v. *Davenport*, 22 How. 243; *Trade Mark Cases*, 100 U. S. 82; *Wabash Ry. Co.* v. *Illinois*, 118 U. S. 565; *Hall* v. *De Cuir*, 95 U. S. 485; *Railway Co.* v. *Mississippi*, 133 U. S. 587; *Plessy* v. *Ferguson*, 163 U. S. 537; *Covington Bridge Co.* v. *Kentucky*, 154 U. S. 209 *et seq.; The Daniel Ball*, 10 Wall. 564.

No argument in favor of the theory of exclusive Federal control can be predicated upon the theory of inferred powers under the Constitution and outside of the express and enumerated powers of the Constitution. This is a government of enumerated powers. It is true as a general proposition that all means necessary to the carrying out of these enumerated powers exist in Congress within the fair implication of the powers granted, but such implications may not be used, however apparently needful and expedient they may seem to be, to annul a plain reservation from or limitation upon the exercise of such enumerated powers. See discussion of these questions

in *Kansas* v. *Colorado*, 206 U. S. 80, 93, and *Fairbank* v. *United States*, 181 U. S. 283.

Mr. Justice Brewer, after making the foregoing statement, delivered the opinion of the court.

All questions arising under the constitution and laws of the State of Kansas are settled adversely to the plaintiff in error by the decision of the Supreme Court of the State. *Merchants' Bank* v. *Pennsylvania*, 167 U. S. 461, and cases cited in the opinion. This brings within a narrow range the controversy which this court is called upon to decide.

Coming directly to that, counsel for plaintiff in error contend that no duty was imposed on the railroad company by act of the legislature or mandate of commission or other administrative board. Conceding this, it is also true that the Missouri Pacific was a common carrier, and as such was engaged in the work of transferring cars from the Santa Fe track to the mill company, and after this controversy arose continued like transfer for all industries located on the Missouri Pacific at Stafford, except the mill company. While no one can be compelled to engage in the business of a common carrier, yet when he does so certain duties are imposed which can be enforced by mandamus or other suitable remedy. The Missouri Pacific engaged in the business of transferring cars from the Santa Fe track to industries located at Stafford, and continued to do so for all parties except the mill company. So long as it engaged in such transfer it was bound to treat all industries at Stafford alike, and could not refuse to do for one that which it was doing for others. No legislative enactment, no special mandate from any commission, or other administrative board was necessary, for the duty arose from the fact that it was a common carrier. This lies at the foundation of the law of common carriers. Whenever one engages in that business the obligation of equal service to all arises, and that obligation, irrespective of legislative action or special mandate, can be enforced by

the courts.   Neither is there any significance in the absence of
a special contract between the Missouri Pacific and the mill
company.   It appears that the practice theretofore had been
for the Missouri Pacific to charge the Santa Fe for the transfer,
that the latter collected the total freight and paid the Mis-
souri Pacific its switching charges.   There is no suggestion
that the amount of this charge was changed in favor of any
other shipper, and so long as that was so it was the charge
which the Missouri Pacific was entitled to make for cars trans-
ferred at the instance of the mill company.   If in the future a
change is made in behalf of shippers generally, undoubtedly
that change can be made operative in respect to the mill com-
pany.   Indeed, all these questions are disposed of by one well-
established proposition, and that is that a party engaging in
the business of a common carrier is bound to treat all shippers
alike and can be compelled to do so by mandamus or other
proper writ.

But the main contention on the part of the Missouri Pacific
runs along an entirely different line.   It is that the Missouri
Pacific and the Santa Fe are common carriers, engaged in
interstate commerce, and as such are subject to the control of
Congress, and, therefore, in these respects not amenable to
the power of the State.   It appears from the findings that
about three-fifths of the flour of the mill company is shipped
out of the State, while the other two-fifths is shipped to points
within the State.   In addition, the hauling of the empty cars
from the Santa Fe track to the mill was, if commerce at all,
commerce within the State.

The roads are, therefore, engaged in both interstate commerce
and that within the State.   In the former they are subject to
the regulation of Congress; in the latter to that of the State, and
to enforce the proper relation between Congress and the State
the full control of each over the commerce subject to its do-
minion must be preserved.   *Fairbank* v. *United States*, 181 U. S.
283.   How the separateness of control is to be accomplished it
is unnecessary to determine.   Its existence is recognized in the

first section of the Interstate Commerce Act of February 4, 1887, c. 104, 24 Stat. 379, as well as in that of June 29, 1906, c. 3591, 34 Stat. 584, for each provides:

"That the provisions of this act shall not apply to the transportation of passengers or property, or to the receiving, delivering, storage, or handling of property wholly within one State and not shipped to or from a foreign country from or to any State or Territory as aforesaid."

This case does not rest upon any distinction between interstate commerce and that wholly within the State. It, is the contention of counsel for the mill company that it comes within the oft-repeated rule that the State, in the absence of express action by Congress, may regulate many matters which indirectly affect interstate commerce, but which are for the comfort and convenience of its citizens. Of the existence of such a rule there can be no question. It is settled and illustrated by many cases.

Thus in *Cooley* v. *Board of Wardens of Port of Philadelphia*, 12 How. 299, it was held that a regulation of pilots and pilotage was a regulation of commerce within the grant of the power to Congress, but further that (p. 319):

"The mere grant of such a power to Congress did not imply a prohibition on the States to exercise the same power; that it is not the mere existence of such a power, but its exercise by Congress, which may be incompatible with the exercise of the same power by the States, and that the States may legislate in the absence of Congressional regulations. *Sturges* v. *Crowninshield*, 4 Wheat. 193; *Houston* v. *Moore*, 5 Wheat. 1; *Wilson* v. *Blackbird Creek Company*, 2 Pet. 251."

In *Cleveland &c. Ry. Co.* v. *Illinois*, 177 U. S. 514, is a collection by Mr. Justice Brown, speaking for this court, of a number of these cases. We quote from the opinion (pp. 516–517):

"Few classes of cases have become more common of recent years than those wherein the police power of the State over the vehicles of interstate commerce has been drawn in question. That such power exists and will be enforced, notwithstanding

the constitutional authority of Congress to regulate such commerce, is evident from the large number of cases in which we have sustained the validity of local laws designed to secure the safety and comfort of passengers, employés, persons crossing railway tracks, and adjacent property owners, as well as other regulations intended for the public good.

"We have recently applied this doctrine to state laws requiring locomotive engineers to be examined and licensed by the state authorities (*Smith* v. *Alabama*, 124 U. S. 465); requiring such engineers to be examined from time to time with respect to their ability to distinguish colors (*Nashville &c. Railway* v. *Alabama*, 128 U. S. 96); requiring telegraph companies to receive dispatches and to transmit and deliver them with due diligence, as applied to messages from outside the State (*Western Union Tel. Co.* v. *James*, 162 U. S. 650); forbidding the running of freight trains on Sunday (*Hennington* v. *Georgia*, 163 U. S. 299); requiring railway companies to fix their rates annually for the transportation of passengers and freight, and also requiring them to post a printed copy of such rates at all their stations (*Railway Company* v. *Fuller*, 17 Wall. 560); forbidding the consolidation of parallel or competing lines of railway (*Louisville & Nashville R. R.* v. *Kentucky*, 161 U. S. 677); regulating the heating of passenger cars, and directing guards and guard posts to be placed on railroad bridges and trestles and the approaches thereto (*N. Y., N. H. &c. R. R.* v. *New York*, 165 U. S. 628); providing that no contract shall exempt any railroad corporation from the liability of a common carrier or a carrier of passengers, which would have existed if no contract had been made (*Chicago, Milwaukee &c. Ry.* v. *Solan*, 169 U. S. 133); and declaring that when a common carrier accepts for transportation anything directed to a point of destination beyond the terminus of his own line or route, he shall be deemed thereby to assume an obligation for its safe carriage to such point of destination, unless at the time of such acceptance such carrier be released or exempted from such liability by contract in writing, signed by the owner or his agent (*Richmond & Alleghany Rail-*

*road* v. *Patterson Tobacco Company*, 169 U. S. 311). In none of these cases was it thought that the regulations were unreasonable or operated in any just sense as a restriction upon interstate commerce."

- See also *Missouri, Kansas & Texas Railway* v. *Haber*, 169 U. S. 613, 626; *Wisconsin &c. Railroad Company* v. *Jacobson*, 179 U. S. 287; *Reid* v. *Colorado*, 187 U. S. 137.

On the other hand, it is said that Congress has already acted, has created the Interstate Commerce Commission, and given to it a large measure of control over interstate commerce. But the fact that Congress has entrusted power to that commission does not, in the absence of action by it, change the rule which existed prior to the creation of the commission. Congress could always regulate interstate commerce, and could make specific provisions in reference thereto, and yet this has not been held to interfere with the power of the State in these incidental matters. A mere delegation by Congress to the commission of a like power has no greater effect, and does not of itself disturb the authority of the State. It is not contended that the commission has taken any action in respect to the particular matters involved. It may never do so, and no one can in advance anticipate what it will do when it acts. Until then the authority of the State in merely incidental matters remains undisturbed. In other words, the mere grant by Congress to the commission of certain national powers in respect to interstate commerce does not of itself and in the absence of action by the commission interfere with the authority of the State to make those regulations conducive to the welfare and convenience of its citizens. Running through the entire argument of counsel for the Missouri Pacific is the thought that the control of Congress over interstate commerce and a delegation of that control to a commission necessarily withdraws from the State all power in respect to regulations of a local character. This proposition cannot be sustained. Until specific action by Congress or the commission the control of the State over these incidental matters remains undisturbed. But it is further contended that this is

not a mere incidental matter, indirectly affecting interstate commerce, but directly a part of such commerce, and therefore beyond the power of the State to control, and in support of that, *McNeill.* v. *Southern Railway Company*, 202 U. S. 543, is referred to. There are many points of resemblance between that case and this, but there is this substantial distinction: In that was presented and determined solely the power of a state commission to make orders respecting the delivery of cars engaged in interstate commerce beyond the right of way of the carrier and to a private siding—an order which affected the movement of the cars prior to the completion of the transportation, while here is presented, as heretofore indicated, the question of the power of the State to prevent discrimination between shippers, and the common law duty resting upon a carrier was enforced. This common-law duty the State, in a case like the present, may, at least in the absence of Congressional action, compel a carrier to discharge.

We see no error in the ruling of the Supreme Court of Kansas, and its judgment is

*Affirmed.*

MR. JUSTICE HOLMES. I concur in the judgment on the ground that the cars had not yet been appropriated to interstate commerce, and so were subject to state control. For this reason I have not found it necessary to make up my mind on the considerations that will be urged by Mr. Justice Moody, although I am inclined to agree with his views.

MR. JUSTICE MOODY, dissenting.

. I find myself unable to agree in the reasoning by which the judgment of the state court is affirmed. Upon the peculiar facts of this case, it is possible to say that the cars, whose transfer was directed, did not become the subjects of interstate commerce until they had been selected as such after their delivery upon the tracks of the Santa Fe Railroad. If the decision were put upon that ground, I should be silent.

But it is assumed that three-fifths of them were interstate shipments, and with respect to such shipments, I am constrained to believe that the judgment of the court below exceeded the power of the State. The division of the governmental power over commerce made by the Constitution, by which the control of interstate commerce is vested in the Nation and the control of intrastate commerce is vested in the States, together with the fact that both kinds of commerce are often conducted by the same persons and corporations through the same agencies gives rise to highly perplexing questions in practice. The regulation of carriers and other instrumentalities of commerce is constantly undertaken both by the Nation and the States, and the extent and limit of the respective powers vested in each government, as far as possible, ought to be accurately ascertained and declared. This is demanded imperatively by the orderly conduct of the vast transportation agencies which are engaged in both kinds of commerce. They ought not to be left uncertain as to the power to which they are responsible.

I venture to think that the weight of authority establishes the following principles: The commerce clause of the Constitution vests the power to regulate interstate commerce exclusively in the Congress and leaves the power to regulate intrastate commerce exclusively in the States. Both powers being exclusive, neither can be directly exercised except by the government in which it is vested. Though the State may not directly control interstate commerce, it may often indirectly affect that commerce by the exercise of other governmental powers with which it is undoubtedly clothed. And this indirect effect may be allowed to operate until the Congress enacts legislation conflicting with it, to which it must yield as the paramount power. *Gibbons* v. *Ogden,* 9 Wheat. 1, 204; *Atlantic Coast Line* v. *Wharton,* 207 U. S. 328, 334; *Asbell* v. *Kansas,* 209 U. S. 251.

In the case at bar, upon the facts as they are assumed to exist, it seems to me that the judgment of the court below

directly regulated interstate commerce. If this is so, it is unimportant that the Congress has been silent. A power clearly withdrawn from the State and vested in the Nation, can no longer be exercised by the States, even though the Congress is silent. Where the Congress fails to act, the subject enjoys freedom from direct control.

The principles which I have stated have been recently applied by this court in the case of *McNeill* v. *Southern Railway Company*, 202 U. S. 543. I cannot escape from the conviction that that case requires a reversal of the judgment of the court below, so far as it assumes to direct the conduct of interstate commerce. In that case the place of business of a private corporation was reached by a spur track connecting with the main track of the railroad. It had been the custom of the railroad to deliver cars consigned to this corporation from the main track to the spur track. In consequence of a dispute concerning demurrage, the railroad refused to continue thus to deliver cars. The State Commission made an order requiring the railroad to deliver certain cars engaged in interstate commerce upon the spur track on payment of freight charges. The order was held to be a regulation of such commerce, and repugnant to the commerce clause of the Constitution. In that case the regulation affected the last stages of the interstate journey. In this case it affects the first stages of the interstate journey. But in each case the commerce which was regulated was interstate. In that case the order was issued by a Commission and in this case by a court. But nothing turns upon that distinction, for by whatever state agency the power is exercised it is void, because it exceeds the authority which may rightfully be conferred by the State upon any agency.

I am not ready to assent to the proposition that although the Congress has vested in the Interstate Commerce Commission the authority to deal with the exact situation presented to us, that fact is immaterial, because the Commission has taken no action. If the Commission has the authority to deal with a question of this kind, those who have grievances ought to

resort to that body for relief. It is a very great hardship to subject the carriers to possibly conflicting regulations and leave them uncertain which government may rightfully assert its controlling authority. So it was said in the *McNeill case* that the order there "asserted a power concerning a subject directly covered by the act of Congress to regulate commerce, and the amendments to that act, which forbid and provide remedies to prevent unjust discriminations and the subjecting to undue disadvantages by carriers engaged in interstate commerce." This statement was made as an additional reason for holding the state action invalid, and seems in conflict with the holding in this case.

I am authorized to state that MR. JUSTICE WHITE joins in this opinion.