Summers, C. J.
This action was commenced in the court of common pleas of Jackson county to recover a penalty for the violation- of the statute making it. unlawful for any common carrier engaged in moving traffic by railroad between points within this state “to haul, or permit to be hauled, or used on its line, any locomotive, car, tender, or-similar vehicle used in moving state traffic, not' equipped with couplers coupling automatically by. impact, and which can be uncoupled, without the necessity of men going between the ends of the cars,” passed March 19, 1906, Section 3365-27b, Revised Statutes (98 O. L., 75).
It is averred in the petition that the defendant hauled and used a car, in this state for moving-state traffic, not equipped as required by the statute. The defendant for answer pleaded two defenses. First, that it is a railroad corporation in-: corporated under the laws of the state of Michigan, and that it owns and operates a railroad from the' city of Detroit in that state to the city of Ironton in the state of Ohio; that it was engaged in inter-1 state commerce, and that all its locomotives and cars, including the locomotive and all cars in the train described in the petition, were frequently and commonly used and engaged in said interstate traf- ■ fic. “That by reason of the premises all of the business of this defendant involving the use and operation of its said railroad and equipment is. subject to the exclusive power of the congress of the United States to regulate commerce among the several states, which power has been exercised by said congress in the several acts to regulate inters' state commerce and carriers of interstate traffic; *66 to-wit.” Then reference is made, among others, to the so-called safety appliance act of March 2, 1893, as amended April 1, 1896, and March 2, 1903. It is then averred that the state statute is in conflict with these acts of congress and is, therefore, void. The second defense is to the effect that the car in question was in a train of cars, including a number of cars being used in moving interstate traffic, and that it was, therefore, exclusively within the regulations of congress.'' A general demurrer was filed to each defense and sustained, and a judgment for plaintiff entered. The circuit court affirmed and error is prosecuted here.
The admitted facts are, that the defendant is a common carrier operating a railroad in moving interstate and intra-state traffic, that the car in question was at the time complained of in use in moving state traffic, that the car, and the railroad over which it was being hauled, were commonly and usually used in interstate traffic, and that the car was in a train in which there were a number of cars loaded with interstate traffic.
Counsel for plaintiff in error contend, in effect, that the statute is void on the ground .that congress, under the authority conferred upon it by the constitution, Article I, Section 8, to regulate commerce among the several states, having enacted regulations respecting automatic couplers on cars upon railroads engaged in interstate traffic, the state is without power to legislate upon the subject, or to prescribe the kind of couplers for a car in use in hauling intra-state traffic, if the car is commonly used in interstate traffic, or is in a train, some of the cars of which are in use in interstate traffic, *67 or is on a railroad engaged in interstate traffic. Or to quote them, they say, “The questions are:
“1. Does the fact that the car in question was commonly and usually employed in interstate traffic, although it was at the particular time actually carrying. intra-state traffic, subject it to the federal control in such wise as to take it out of the state control ?
“2. Does the fact that it was part of a train cpntaining other cars loaded with interstate traffic (and which are therefore subject to the federal act), have the effect to bring this particular car also within the operation of the federal act in such wise as to take it out of state control?
“3. Does the fact that the railroad was commonly and usually employed in interstate commerce and that defendant was engaged in business as an interstate carrier, have such effect?” And their contention is that each question should receive an answer in the affirmative.
If the statute regulates interstate commerce, or enacts regulations in conflict with valid federal regulations of such commerce, it is invalid. In Atlantic Coast Line Railroad Co. v. Wharton et al., 207 U. S., 328, it is held that, “Any exercise of state authority, whether made directly or through the instrumentality of a commission, which directly regulates interstate commerce is repugnant to the commerce clause of the federal constitution.”
The statute in question does not purport to be a regulation of interstate traffic, but is limited strictly to the moving of traffic from one point to another in the state, and it is evident from its várious requirements as well as its title that it was *68 passed in the exercise of the police power of the state to promote the safety in the state of employes and travelers upon railroads, and without any thought or intention of meddling with interstate commerce.
The original safety appliance act so-called, passed March 2, 1893, by congress was entitled as follows:
“An act to promote the safety of employes and travelers upon railroads by compelling common carriers, engaged in interstate commerce to equip their cars with automatic couplers and continuous brakes and their locomotives with driving-wheel brakes, and for other purposes.”
Section 2 of that act provides as follows:
“That on and after the first day of January, eighteen hundred and ninety-eight, it shall be unlawful for any such common carrier to haul or permit to be hauled or used on its line any car used in moving interstate traffic not equipped with couplers coupling automatically by impact, and which can be uncoupled without the necessity of men going between the ends of the cars.”
And by the amendment of March 2, 1903, it was further provided that the provisions and regulations of this safety appliance act—
“Shall be held to apply to all trains, locomotives, tenders, cars and similar vehicles used on any railroad engaged in interstate commerce * * * and to all other locomotives, tenders, cars and similar vehicles used in connection therewith.” 32 U. S. Stats., p. 943; U. S. Compiled Stats., 1901, p. 3174; Supp. U. S. Comp. Stat. 1903, p. 367.
*69 Whether the original act of congress, properly-interpreted, applies to cars while not employed in interstate traffic, and whether the amendment in so far as it attempts to regulate cars while not so engaged in interstate traffic does not transcend the powers of congress, we need not consider.
In Voelker v. Chicago, M. & St. P. Ry. Co., 116 Fed. Rep., 867-873, in referring to the act of congress of 1893, Shiras, district judge, says, “Legislation on this matter of the use of automatic couplers was sought and obtained from congress, as well as from the state legislature; so that the companies would not be afforded a loophole for escape from liability on the theory that the agencies used in interstate commerce are without the control of the state legislation.” And in the same case in the circuit court of aopeals, before Sanborn, Thayer and Van Devanter, circuit judges, Chicago, M. & St. P. Ry. Co. v. Voelker, 129 Fed. Rep., 522-527, Van Devanter, J., says: “The two statutes, federal and state, seem to have been enacted in pursuance of a common purpose to afford a remedy as broad as the mischief, and to remove the source or cause of the latter through the compulsory adoption and use of a new system of coupling and uncoupling which dispensed with the necessity of any one going between, or at least entirely between, the cars.”
Our statute does not conflict with the federal statute in the character of the coupler required, but requires the same kind of coupler, and was parsed to promote the same object, though under a different power, and, while no doubt it was enacted to apply to cases assumed not to be -covered by the federal statute, it is not unreasonable, and *70 is not void merely because a failure to equip the car with automatic couplers would subject the railroad company to punishment under a state statute as well as under the act of congress. “The same act or series of acts may constitute an offense equally against the United States and the state, subjecting the guilty party to punishment under the laws of each government.” Cross v. North Carolina, 132 U. S., 131.
The regulation of commerce among the states is within the exclusive jurisdiction of congress, but it is well settled that a state statute, enacted in the exercise of its police power, not regulating or directly affecting" interstate commerce or in conflict with federal regulations, but merely regulative of the instrumentalities of commerce, is not void; and when such state regulations do conflict with federal regulations, they are not void on the ground that the state has exercised a power exclusively in congress, but because the constitution and the laws of the United States made in pursuance thereof are the supreme law of the land.
It is unnecessary to cite the cases by which these principles are established, they are cited in the following very recent cases upon which we base our decision. In Asbell v. Kansas, 209 U. S., 251, where a statute of the state of Kansas making it a misdemeanor to transport cattle into the state without inspection, was upheld against the contention that it interfered with interstate commerce and also conflicted with a statute of the United States and the rules and regulations of the department of agriculture, it is held: “While .the state may not legislate for the direct control of interstate *71 commerce,, a proper police regulation which does not conflict with congressional legislation on the subject involved is not necessarily unconstitutional because it may have an indirect effect upon interstate commerce.” In Missouri Pacific Railway Co. v. Larabee Flour Mills Co., 211 U. S., 612, in which a peremptory writ of mandamus was allowed by the supreme court of Kansas, commanding one railroad company to transfer cars to and from a mill on another railroad, and which was affirmed, it is said by Mr. Justice Brewer: “The roads are, therefore, engaged in both interstate commerce and that within the state. In the former they are subject to the regulation of congress;.in the latter to that of the state, and to enforce the proper relation between congress and the state the full control of each over the commerce subject to its dominion must be preserved.” Again he says, (623) : “Running through the entire argument of counsel for the Missouri Pacific is the thought that the control. of congress over interstate commerce and a delegation of that control to a commission necessarily withdraws from the state all power in respect to regulations of a lpcal character. This proposition cannot be sustained.” Mr. Justice Moody, dissenting (624), says: “I venture to think that the weight of authority establishes the following principles: The commerce clause of the constitution vests the power to regulate interstate commerce exclusively in the congress and leaves the power to regulate intra-state commerce exclusively in the states. Both powers being exclusive, neither can be directly exercised except by the government in which it is vested. Though the state may not *72 directly control interstate commerce, it may often indirectly affect that commerce by the exercise of other governmental powers with which it is undoubtedly clothed. And this indirect effect may be allowed to operate until the congress enacts legislation conflicting with it, to which it must yield as the paramount power. Gibbons v. Ogden, 9 Wheat., 1, 204; Atlantic Coast Line v. Wharton, 207 U. S., 328/334; Asbell v. Kansas, 209 U. S. 251.”
It follows that the questions propounded by counsel should receive a negative answer, and the judgment is affirmed.

Judgment affirmed.

Crew, Spear, Davis, Si-iauck and Price, JJ., concur.