Hillsborough,
June 26, 1930.

MILFORD QUARRY & CONSTRUCTION CO.
*v.*
BOSTON & MAINE RAILROAD.

408

*Bertis A. Pease* and *Doyle & Doyle* (*Mr. Paul J. Doyle* orally), for the plaintiff.

*Warren, Howe & Wilson* (*Mr. Robert P. Bingham* orally), for the defendant.

MARBLE, J. In 1903 the Lovejoy Granite Company owned and operated the Merrill and Stevens quarries, so-called, in Milford. A spur track extended from the defendant's main line in South Milford to a quarry located near the Lovejoy property and known as the Kittredge quarry. It does not appear whether the defendant owned this track or not. On April 16, 1903, the Lovejoy company entered into a written contract with the defendant whereby the latter agreed "to lay a side track, running from the Kittredge Quarry Track at South Milford, N. H.," to the Lovejoy company's quarries, and that company agreed to pay "all the expenses of laying said track." The defendant impliedly agreed to convey cars over this sidetrack to and from the quarries in question. The contract contained an express stipulation limiting damages and providing for indemnity in case of injury caused by the defendant's engines. After two years, either party could terminate the agreement on sixty days' notice. The

track was laid in accordance with a plan attached to the contract, and was fully paid for by the Lovejoy company. The agreement was a personal one, and did not extend to the Lovejoy company's successors or assigns. It was entitled "Form 10."

In 1904 the Lovejoy company sold the Stevens quarry to B. A. Pease and others, and the plaintiff acquired title to the quarry on June 4 of that year. B. A. Pease became the plaintiff's general manager and treasurer. He had previously been treasurer of the Lovejoy company, and in that capacity had conducted the correspondence relating to the sidetrack agreement. On the plan which accompanied the agreement there were two tracks, known as the east and west switchbacks, leading to the derricks at the Stevens quarry. It is the defendant's contention that these switchbacks were not designed to be used by locomotives but merely for the occupation of cars which could be "kicked" in.

The plaintiff, as soon as it began operations at the Stevens quarry, requested the defendant to set cars under the derricks on both switchbacks. This the defendant refused to do (except in a few instances when new train crews were in charge of the switching) on the ground that the curves were too abrupt for engine work. The plaintiff's testimony tended to prove that the defendant had set cars on these switchbacks when the Lovejoy company had been in possession of the quarry, and that the service rendered the Lovejoy company at the Merrill quarry after the plaintiff had purchased the Stevens quarry included the placing of cars under the derricks where they could be loaded.

As a result of the plaintiff's demands, the defendant made some investigation of the situation, following which a crossing frog was installed and a survey made by the defendant's engineers. The defendant submitted the plans of this survey to the plaintiff, but it does not appear that the plaintiff requested the defendant to make the suggested changes or intimated in any way its desire to enter into a sidetrack agreement. On the other hand, it attempted on its own initiative to "cut the grade" and "flatten out the curves" in conformity to the plan. In 1906, after this work had been done, the division superintendent in company with another official inspected the tracks and suggested the substitution of a larger frog. This substitution was later made, but the conductor who was sent with an engine and cars to test the switchbacks as thus altered "said he would report the result, but would not go in there again unless he was ordered to."

During the year 1907 the trainmen left cars below the switch but did not attempt to set them in on either of the switchbacks. On July 24, 1907, Pease, as agent for the plaintiff, wrote the division superintendent a long letter reviewing the history of the controversy, and claiming that his company was not receiving "equal and reasonable service." To this letter the division superintendent replied in part as follows: "In regard to switchback referred to, it is absolutely impossible to operate this track with locomotives. We have tried to put it in shape for our engines but the curve is too sharp. The only way I can see for you to do is to have track worked out which can be operated by our engines and put in under the usual side track agreement. It was never intended to have this track worked by locomotives and everyone on the hill understands this."

The plaintiff apparently ignored the suggestion that the parties enter into the usual sidetrack agreement, but on April 4, 1908, again wrote the division superintendent charging the defendant with discrimination. The superintendent answered: "I will have our Trainmaster go up on the Branch and if it is possible to set cars on your track, we will do so." A few days later a train crew came to the quarry and tested both switchbacks. The engine went over the east switchback without mishap, but was derailed on the west switchback because the ties were "not in shape." There were no subsequent developments of importance until 1911, when the plaintiff brought its first suit against the defendant.

The declaration in the present action alleges a failure of the defendant to comply with the provisions of P. S., c. 160, s. 1. This statute requires a railroad to furnish to all persons reasonable and equal terms, facilities and accommodations for the transportation of persons and property over its road, and is merely declaratory of the common law. *McDuffee* v. *Railroad*, 52 N. H. 430, 457.

"At common law the duty of the railroad as a carrier of freight is confined to taking up or setting down freight along its route, or more exactly beside its tracks as constructed." It "cannot be compelled to perform the shunting service over the private spur of the shipper, as it cannot be compelled to haul beyond its own rails. On the other hand if it undertakes such service generally it must apparently perform the service for all shippers indifferently at reasonable rates." Wyman, Public Service Corporations, s. 821. See also *Missouri Pac. Ry. Co.* v. *Company*, 211 U. S. 612, 619; *Atchison, Topeka &c. R. R. Co.* v. *Railroad*, 110 U. S. 667, 680.

There is absolutely no evidence whatever in the present case of a

general undertaking on the part of the defendant to perform switching service on a shipper's premises unless the shipper has entered into the customary sidetrack agreement. The plaintiff did not succeed to the rights of the Lovejoy company under that company's agreement, nor did it enter into any written contract with the defendant on its own behalf. Such service as the defendant attempted to render was purely voluntary, and its suggestion that a track be "put in under the usual side track agreement" was ignored. Obviously the defendant's failure to give the plaintiff the service requested did not constitute a violation of the statute.

"Where a railroad company furnishes sufficient facilities of its own for the receipt and delivery of freight, there is at common law no duty resting upon it to receive or deliver freight upon a private siding or spur track.

"Assuming, but not deciding, that a custom so to do can arise of such character as to impose this duty upon railroad companies, the evidence in the case at bar is wholly insufficient to establish such a custom. At most, it simply shows that railroad companies do receive and deliver freight upon such spur tracks, but generally, not always, upon a contract or understanding mutually agreeable to the parties thereto.

"Receiving and delivering freight upon such spur track is, therefore, purely a matter of contract, to which either party may attach any condition desired; and since the contract which appellee offers to make with appellant with reference to such receipt and delivery of freight is identical with the contract entered into by it with all other compresses on its line, there is, of course, no discrimination in this regard by appellee against appellant." *Gulf Compress Co.* v. *Railroad*, 100 Miss. 582, 588. See also 1 A. L. R. 1425; 32 A. L. R. 193; 4 R. C. L. 680, 681.

The case of *Boston & Maine Railroad* v. *Company*, 79 N. H. 467, relates to a discriminative contract. The question of the shipper's right to demand switching service in the absence of a contract is not there presented.

The presiding judge instructed the jury that the defendant was under no duty to set cars on the switchbacks for the plaintiff unless the parties had entered into an agreement on the subject, and that the question whether or not there was a contract, implied or otherwise, growing out of the negotiations, conversations and correspondence between the plaintiff and the defendant relative to the changes which were afterwards made in the east switchback, the installation

of a new frog and the expenditures made by the plaintiff in that connection, was for the jury to determine. The defendant excepted to the submission of this question to the jury.

The plaintiff brought its first suit against the defendant on April 20, 1911. The defendant's motion to quash the writ in that suit was granted October 9 without exception. A second suit was brought October 1, 1911. The declaration alleged a violation of P. S., c. 160, ss. 1, 2. The plaintiff took a voluntary nonsuit in that action January 23, 1914. The present suit was instituted December 19, 1914, and the declaration again alleged a violation of the statute. The case was transferred to this court on the plea of the statute of limitations, and it was held (78 N. H. 176) that the plaintiff might maintain the new action (since it was brought within a year after the voluntary nonsuit) for the same cause for which the action of October 1, 1911, had been brought. P. S., c. 217, s. 9. As already noted, the sole cause for which that action was brought was an alleged violation of P. S., c. 160, ss. 1, 2. See *Milford Quarry &c. Co.* v. *Railroad*, 79 N. H. 525.

Assuming, then, that the evidence warrants a finding that the defendant impliedly agreed to furnish the service requested, any right to recover for a breach of that agreement was long ago barred by the statute of limitations.

This result makes consideration of the other exceptions unnecessary.

*Judgment for the defendant.*

All concurred.