STATE OF MISSOURI at the relation and to the use of L. W. BALDWIN and GUY THOMPSON, Trustees for the MISSOURI PACIFIC RAILROAD COMPANY, a Corporation, Appellants, v. PUBLIC SERVICE COMMISSION, and JOHN C. COLLET, HARRY E. McPHERSON, GEORGE H. ENGLISH, WM. STOECKER and W. M. ANDERSON, Members of the Public Service Commission.—99 S. W. (2d) 90.

Division One, November 12, 1936.

*H. H. Larimore* and *Thos. J. Cole* for appellants.

*James P. Boyd*, General Counsel, and *Daniel C. Rogers*, Assistant Counsel, for Public Service Commission; *Thomas L. Phillips* of counsel.

816

FRANK, J.—This is an appeal from a judgment of the Circuit Court of Cole County approving an order of the Public Service Commission made in a cause entitled Midwest Coal Traffic Bureau v. Missouri Pacific Railroad Company, L. W. Baldwin and Guy A. Thompson, Trustees.

We take our statement, in substance, from appellants' brief which we find to be correct.

This controversy grew out of allowances made by certain railroads to consignees on shipments of coal to Jefferson City, Missouri. The main line and two branch lines of the Missouri Pacific Railroad enter Jefferson City, so that such railroad can deliver coal in carload lots on its tracks in said city. Two other railroads figure in this controversy; the Missouri-Kansas-Texas Railroad, commonly called the Katy and the Alton Railroad, for brevity called the Alton. The allowances made to shippers by these two railroads are only incidentally involved because they were not parties to the action before the commission.

The tracks of the Katy and Alton do not reach or enter Jefferson City, but terminate near the north bank of the Missouri River, the

former at North Jefferson and the latter at Cedar City. However, both attempted to serve Jefferson City, and published rates to Jefferson City, although that point was not located on either of their lines. There is no railroad bridge across the Missouri River at Jefferson City.

To compete with the Missouri Pacific whose tracks reach and enter Jefferson City, the Katy and the Alton published an unloading allowance of forty-five cents per ton on traffic billed to Jefferson City. That is, a shipper by routing a fifty ton carload of coal over the Katy, and by hauling such coal by truck from North Jefferson across the vehicular bridge to Jefferson City, would secure a reduction of $22.50 per car in the charge. The result of this allowance caused coal merchants of Jefferson City to ship much of their coal over the Katy and Alton, then move it by truck to Jefferson City in order to get the allowance.

To meet this competition the Missouri Pacific published a similar allowance of forty-five cents per ton on both intrastate and interstate traffic destined to Jefferson City. It found that as to intrastate traffic, after payment of this allowance to the consignee, in many cases there was little, and in some cases, nothing left. It then attempted to amend its tariffs so as to provide that an allowance would not be paid to the shipper until the carrier had collected gross revenue of $25 per car on single-line movements and $50 per car on joint-line movements. The Public Service Commission refused to permit this to be done.

Thereafter the Missouri Pacific canceled the forty-five cents per ton allowance on both intrastate and interstate traffic. The result was that much of the coal traffic from Illinois to Jefferson City which was formerly shipped over the Missouri Pacific began to be shipped over the Katy and Alton. To recover this traffic the Missouri Pacific restored the allowance of forty-five cents per ton on interstate shipments, with the restriction that it had formerly attempted to put on intrastate traffic, to the effect that before such allowance was paid to the shipper, there must be gross revenue per car of $25 single-line and $50 joint-line.

It will be observed that what the Missouri Pacific finally established as to interstate traffic was what it had theretofore attempted to establish on intrastate traffic, but the Public Service Commission would not permit it to be done.

Following the re-establishment of the forty-five cents per ton allowance to shippers on interstate shipments destined to Jefferson City, the Missouri Midwest Coal Traffic Bureau, representing numerous coal shippers, filed a complaint with the Public Service Commission charging that the forty-five cents per ton allowance to the shipper on interstate shipments of coal to Jefferson City, gave such interstate shipper an undue and unreasonable advantage and preference over

persons and companies shipping coal intrastate to Jefferson City, on which the forty-five cents per ton allowance is not made.

Other facts, if necessary to a determination of the case, will be stated in course of the opinion.

The intrastate rate in force at the time in question had been theretofore fixed by the Public Service Commission as a lawful and reasonable rate. The reasonableness of this intrastate rate is not an issue in this proceeding. That question was not raised nor determined. We must, therefore, assume that the intrastate rate was a lawful and reasonable rate. The substance of the commission's order is that the Missouri Pacific must either raise its interstate rates forty-five cents per ton or lower its intrastate rates to that extent. If it raises its interstate rates by canceling the forty-five cents per ton it allows to interstate shippers, the result will be a loss of much of its interstate business to the Katy which makes the forty-five cents per ton allowance to interstate shippers. The effect of the order is to say to the Missouri Pacific, you must either lower your interstate rate forty-five cents per ton, or pay a penalty for failing to do so, by carrying intrastate shipments of coal at forty-five cents per ton less than the commission has fixed as a reasonable rate for such carriage. Such an order directly burdens interstate commerce and is an attempt to regulate and fix the rates for the carriage of such commerce. The Supreme Court of the United States has so held in analogous cases. [See Louisville & Nashville Ry. Co. v. Eubank, 184 U. S. 27, 1. c. 40.] The cited cases involved the construction of the long and short haul clause of the Kentucky Constitution. That clause, in substance, makes it unlawful for a railroad operating in Kentucky to charge or receive any greater compensation in the aggregate for the transportion of persons or property of like kind under substantially like circumstances and conditions for a shorter than a longer distance over the same line in the same direction, the shorter being included in the longer distance. This constitutional provision was under review in Louisville & Nashville Ry. Co. v. Kentucky, 183 U. S. 503. It was there held valid because it did not in terms embrace the case of interstate traffic, but controlled traffic between points within the State of Kentucky.

In the Eubank case, supra, the State Court of Kentucky held that such long and short haul clause was not confined to a case where the long and short hauls were both within the State of Kentucky but embraced a long haul from a place outside of to one within the State, and a shorter haul between points on the same line and in the same direction, both of which were within the State. On appeal the Supreme Court of the United States reversed the State Court of Kentucky.

The facts in the Eubank case were that the Louisville & Nashville Railway had in effect from Nashville, Tennessee, through Franklin,

Kentucky, to Louisville, Kentucky, an interstate rate on tobacco of twelve cents per hundred pounds which was lower than the intrastate rate from Franklin, Kentucky, to Louisville, Kentucky. The State Court held that the railroad could not charge more for the short haul from Franklin, Kentucky, to Louisville, Kentucky, than it charged for the long haul from Nashville, Tennessee, to Louisville, Kentucky. It was contended that in so holding such order did not regulate interstate rates, but simply directed that between points in the State of Kentucky the charge should not be greater for a shorter than a longer haul, even though such longer haul might be between a point outside and one in the State. In reversing this holding of the State Court, the Supreme Court of the United States, among other things, said:

"The Nashville owner of tobacco wishes to have it transported to Louisville and asks the defendant to carry it. It responds that it would like to carry it at the rate of twelve cents per one hundred pounds, but that it cannot do so because it has established a reasonable rate between points both of which are in Kentucky, and which rates are more than twelve cents, and that if it were to carry at the rate of twelve cents from Nashville to Louisville it would be necessary, on account of the law of Kentucky, to carry at the same rate all tobacco between all points in that State, which would entail a loss in the business between those points, which the company would not be justified in sustaining; therefore the transportation is declined, for it cannot get more than twelve cents from the Nashville man. Is it an answer to this statement to say that the company can get this business by lowering its rates within the State to the same rate as charged from Nashville? Is it bound, in order to secure this interstate commerce, to lower its rates all through the State? If it be, is not the law which accomplishes this result a direct interference by the State with interstate commerce? And if it do not lower its State rates and in consequence must raise its interstate rates, in order to make its State rates valid, and thus must lose to an appreciable and important extent the interstate commerce, is not a law from which such necessary and direct consequences result a regulation in effect by the State, of that commerce which ought to be free therefrom?"

Again in the case of Huston, E. & W. Texas Railway v. United States, 234 U. S. 342, 354, we find the following pertinent declaration:

"It is also to be noted—as the Government has well said in its argument in support of the Commission's order—*that the power to deal with the relation between the two kinds of rates, as a relation, lies exclusively with Congress. It is manifest that the State cannot fix the relation of the carrier's interstate and intrastate charges without directly interfering with the former,* unless it simply follows the standard set by Federal authority. This question was presented with respect to the long and short haul provision of the Kentucky Con-

stitution, adopted in 1891, which the court had before it in Louisville & Nashville Railroad Co. v. Eubank, 184 U. S. 27. The state court had construed this provision as embracing a long haul, from a place outside to one within the State, and a shorter haul on the same line and in the same direction between points within the State. This court held that, so construed, the provision was invalid as being a regulation of interstate commerce because 'it linked the interstate rate to the rate for the shorter haul and thus the interstate charge was directly controlled by the State law.' [See 230 U. S., pp. 428, 429.]'' (Italics ours.)

The question in the case at bar is sufficiently similar to the question decided in the Eubank case, to make the Eubank case controlling in this case.

■ Relator contends that Congress has never attempted to regulate a situation causing undue prejudice against intrastate commerce and an undue preference to interstate commerce, and until Congress occupies that field, the states are free to take such action as was taken in this case. The following cases are cited in support of this contention. [Hennington v. Georgia, 163 U. S. 299; New York, New Haven & Hartford Railroad Co. v. New York, 165 U. S. 628, 631; Peik v. Chicago & Northwestern Ry. Co., 94 U. S. 164, 177-178; M. K. & T. Ry. Co. v. Harris, 234 U. S. 412, 417; Mo. Pacific Ry. Co. v. Larabee Flour Mills, 211 U. S. 612, 623.]

No useful purpose would be served in a discussion of the cases cited because in the more recent case of Missouri v. Kansas Natural Gas Co., 265 U. S. 298, 307-8, the question was ruled contrary to the contention relator is now making. The court there said:

''The line of division between cases where, in the absence of congressional action, the State is authorized to act, and those where state action is precluded by mere force of the commerce clause of the Constitution, is not always clearly marked. In the absence of congressional legislation, a State may constitutionally impose taxes, enact inspection laws, quarantine laws and, generally, laws of internal police, although they may have an incidental effect upon interstate commerce. [Pennsylvania Railroad Co. v. Hughes, 191 U. S. 477, 488-491.] But the commerce clause of the Constitution, of its own force, restrains the States from imposing direct burdens upon interstate commerce. In Minnesota Rate Cases, 230 U. S. 352, 396, MR. JUSTICE HUGHES, speaking for the court, said: 'If a state enactment imposes a direct burden upon interstate commerce, it must fall regardless of Federal legislation. The point of such an objection is not that Congress has acted, but that the State has directly restrained that which in the absence of Federal regulation should be free.' The question is so fully discussed in that case, that nothing beyond its citation is required.''

"The contention that, in the public interest, the business is one requiring regulation, need not be challenged. But Congress thus far has not seen fit to regulate it, and its silence, where it has the sole power to speak, is equivalent to a declaration that that particular commerce shall be free from regulation."

See also Landon v. Public Utilities Co., 242 Fed. 658, 688.

Our judgment is that the order of the commission under review imposes a direct burden upon interstate commerce. The commission does not contend otherwise but bases its right to make the order on the ground that Congress has never attempted to regulate such a situation as this case presents. Whether Congress has or has not occupied that field, under the ruling in Missouri v. Kansas Natural Gas Co., supra, if the order of the commission is a direct burden upon interstate commerce it must fall regardless of Federal legislation. Since what we have already said necessarily disposes of the case, other questions raised will not be discussed.

The judgment of the circuit court is reversed and cause remanded with directions to that court to set aside the order of the commission. All concur, except *Collet, J.,* not sitting.